[No. 57579-7.    En Banc.    February 27, 1992.]

LANDIS BOHN, ET AL, *Petitioners*, v. GEORGE CODY,
ET AL, *Respondents*.

*Richard D. Wurdeman* and *Wurdeman & Tesch, P.C.*; *Philip A. Talmadge* and *Bernard H. Friedman* of *Talmadge Friedman & Cutler*, for petitioners.

*Eugene H. Knapp, Jr., Karen E. Vedder*, and *Lane Powell Spears Lubersky*, for respondents.

JOHNSON, J. — Lucille and Landis Bohn loaned money to their daughter after discussing aspects of the proposed loan with their daughter's attorney. After their daughter failed to

repay the loan, the Bohns sued the attorney. The attorney moved for summary judgment on the theory that he owed no duty of care to the Bohns, because the Bohns were neither his clients nor were they within the class of third parties to whom an attorney would owe a duty of care. The trial court found that no duty of care existed and dismissed the Bohns' claims in contract and negligence. The trial court also dismissed the Bohns' claim that the attorney had violated the former attorney disciplinary rule regarding conflicts of interest. The Court of Appeals affirmed.

On the issue of duty, we reverse. Although we agree with the courts below that no attorney/client relationship was formed under these circumstances, genuine issues of material fact exist as to whether Bohn was within the class of nonclients to whom an attorney owes a duty of care. We affirm the dismissal of the claim alleging violation of the disciplinary rules.

I

The transaction at issue here had its roots in a foreclosure proceeding involving Dian and Marville Follett. The Folletts had purchased a house on a real estate contract and had subsequently failed to make a $15,000 balloon payment. George Cody represented the Folletts in defending the foreclosure action. The trial judge in the foreclosure action imposed a deadline of June 30, 1982 (plus a 5-day grace period) for the Folletts to pay the entire balance due under the contract.

Dian Follett was unable to obtain a commercial loan to cover the amount owed. She then approached her parents, Lucille and Landis Bohn, to borrow from them the necessary sum. Cody was not involved in these negotiations between the Folletts and the Bohns.

On June 30, 1982, Lucille Bohn met alone with Cody to discuss the situation. According to Cody, he told Lucille Bohn at the outset that he represented the Folletts in this matter, not the Bohns. Lucille Bohn does not dispute these statements.

At that meeting, Lucille Bohn told Cody that she and her husband were interested in paying the amount due under the contract on behalf of her daughter and son-in-law. She wanted to know the total amount due. She then described the agreement that she and her husband had tentatively worked out with the Folletts. The Bohns would receive the deed to the house after the contract was paid in full. The Folletts would have 1 year in which to repay the Bohns, during which time the Folletts could continue to live in the house. If the loan was repaid, the Folletts would get the house back; if not, the Bohns would sell the house and retain the proceeds to the extent of their loan.

Lucille Bohn told Cody that she and her husband were willing to advance the necessary amount only if they could have "absolute security". Cody said he would prepare an assignment of the right to receive the deed from the contract vendors — the Heatheringtons — but added that he could do so only after obtaining the Folletts' approval. Lucille Bohn asked whether she would receive a "free and clear" deed. Cody responded that the deed would be free and clear of any liens resulting from the *Heatheringtons'* ownership of the property. Cody did not say whether any liens could have arisen from the *Folletts'* ownership interest. The Bohns contend that although the information in Cody's statement was technically accurate, it was misleading in its failure to fully address the question asked.

On July 2, 1982, Cody met with Lucille Bohn and Dian Follett. They had further discussions about the amount due under the contract. Later that day, Lucille Bohn posted approximately $50,000 — representing her and her husband's life savings — with the court registry on behalf of the Folletts. The terms of the actual loan were never reduced to writing. Shortly thereafter, Cody prepared a document assigning to the Bohns the right to receive the Heatheringtons' fulfillment deed.

There was a short delay in getting Marville Follett to sign the assignment. Lucille Bohn at this time told Cody's

receptionist (who in turn told Cody) about this problem and asked that she be billed for any additional work on the assignment. Cody discussed the issue with Marville Follett, who then signed the assignment on July 15. Cody then transmitted the document to the Heatheringtons' attorney.

Later in July, the Heatheringtons' attorney made out a deed to the Folletts rather than to the Bohns. Lucille Bohn told Cody of this fact, and Cody indicated he would take care of it. Lucille Bohn offered to pay for his services in this regard. Cody stated, however, that he was doing so on behalf of the Folletts and that he was not acting as the Bohns' attorney. On July 29, Cody sent a letter to the Heatheringtons' attorney demanding that a deed be executed in favor of the Bohns. In this letter, Cody stated that he was "authorized to take court action to enforce the proper preparation and delivery of the deed . . .." On August 5, the Heatheringtons issued a new deed naming the Bohns as grantees.

A few days later, Lucille Bohn learned that Internal Revenue Service (IRS) liens already encumbered the property. The IRS had filed the liens in order to collect unpaid taxes from the Folletts. These liens apparently were in place at the time when Cody discussed the deed with Bohn, but Cody denies knowing of the liens at that time and the Bohns do not argue that Cody actually knew of the liens. The Bohns do contend, however, that Cody should have known that such liens were possible. They point out that Cody represented the Folletts between 1980 and June 1981 with respect to tax disputes, and that even after June 1981 Cody had reason to suspect that the Folletts' tax difficulties continued.

Later in August, Lucille Bohn again approached Cody and insisted on paying Cody for his services. Cody told her that she owed nothing, but when she persisted, he suggested that she pay $50. Bohn paid him this amount but Cody used it to credit the Folletts' account.

The IRS subsequently sold the house to another couple. The Bohns were unable to redeem the house and conse-

quently lost their interest in it. The Folletts never repaid the money to the Bohns.

The Bohns sued Cody for negligence, breach of contract and violation of the attorney disciplinary rules.[1] Their complaint alleges that when Cody first met with Lucille Bohn he should have (1) advised her to seek independent counsel; (2) informed her of his potential conflict of interest in the transaction; (3) recommended that she obtain a title report; or (4) indicated that although the deed would be free of any liens against the Heatheringtons' interest, it could still be subject to any liens against the Folletts' interest. Lucille Bohn stated in an affidavit that she believed that Cody was acting as her attorney at all times relevant to this case.

Cody moved for summary judgment on the basis that he did not owe any duty of care to the Bohns. The superior court judge granted the motion and dismissed with prejudice all three causes of action in the Bohns' complaint. The Court of Appeals affirmed in an unpublished opinion. We granted the Bohns' petition for review.

## II

■ An appellate court reviews de novo a trial court's summary judgment decision. The appellate court analyzes whether any genuine issues exist as to any material fact and whether one party is entitled to judgment as a matter of law. *Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 169, 736 P.2d 249 (1987). The court "consider[s] all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party". *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Any doubts as to the existence of factual disputes must be resolved against the moving party. *Atherton Condominium Apartment-Owners Ass'n Bd. of Directors v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

The trial court granted summary judgment on the basis no duty could have existed if Lucille Bohn was neither Cody's

---

[1]The Bohns have not alleged that Cody acted fraudulently or with intent to harm them.

client nor a third party to whom an attorney would have owed a duty of care. We must decide whether either of these bases for a duty exists.

A. Existence of Attorney/Client Relationship.

■ Determining whether an attorney/client relationship exists necessarily involves questions of fact. *See* 48 Am. Jur. Proof of Facts 2d, *Existence of Attorney-Client Relationship* 525 (1987); 1 R. Mallen & J. Smith, *Legal Malpractice* § 11.2 n.12 (3d ed. 1989). Summary judgment is proper on a factual issue only if reasonable minds could reach but one conclusion on it. *Steinbach*, at 437.

■ The essence of the attorney/client relationship is whether the attorney's advice or assistance is sought and received on legal matters. *See* 1 R. Mallen & J. Smith § 11.2 n.18; 7 Am. Jur. 2d *Attorneys at Law* § 118 (1980). The relationship need not be formalized in a written contract, but rather may be implied from the parties' conduct. *In re McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983). Whether a fee is paid is not dispositive. *McGlothlen*, at 522. The existence of the relationship "turns largely on the client's subjective belief that it exists". *McGlothlen*, at 522. The client's subjective belief, however, does not control the issue unless it is reasonably formed based on the attending circumstances, including the attorney's words or actions. *See* 1 R. Mallen & J. Smith § 8.2 n.12; *Fox v. Pollack*, 181 Cal. App. 3d 954, 959, 226 Cal. Rptr. 532 (1986); *In re Petrie*, 154 Ariz. 295, 299-300, 742 P.2d 796 (1987).

Cody told Lucille Bohn at the outset of their very first meeting that he could not act as her attorney in this matter, as he was already representing the Folletts. Lucille Bohn has not challenged this statement. Moreover, Cody reemphasized this point when he told Lucille Bohn later in the conversation that he would prepare the necessary documentation only upon obtaining the Folletts' approval.

■ ■ Lucille Bohn maintains that despite these clear disclaimers she still believed that Cody was acting as her attorney. She argues that her belief was reasonably held

because Cody gave her legal advice and performed legal services for her. First, she contends that he answered (though not fully) her questions concerning the effect of the assignment of the right to receive the fulfillment deed. An attorney/client relationship is not created, however, merely because an attorney discusses the subject matter of a transaction with a nonclient. *See* 1 R. Mallen & J. Smith § 11.2 n.19. Second, she points out that Cody prepared the assignment paperwork. Yet an attorney for one party to a transaction does not become the other party's attorney merely because he prepared the documents formalizing the transaction. *See* 1 R. Mallen & J. Smith § 8.2 n.22.

Lucille Bohn also relies on the letter Cody wrote seeking reissuance of the fulfillment deed to the Bohns. This letter, however, was written approximately 4 weeks after the conversations were held that form the basis for the Bohns' action. The important consideration here is the reasonableness of Lucille Bohn's belief at the time of the allegedly tortious acts. The occurrence of subsequent events has no bearing on this issue, for we are not concerned with whether Cody was acting as her attorney at a later time, and the letter gives no indication that he was acting as the Bohn's attorney at any prior time.

In light of Cody's disclaimers of any attorney/client relationship and in light of the Bohns' inability to show that Cody acted inconsistently with these statements, we conclude that Lucille Bohn's subjective belief was not reasonably based on the attending circumstances, and no attorney/client relationship was formed. Reasonable finders of fact could reach no other conclusion on the record here presented.

B. Attorney's Duties Toward Third Parties.

Even in the absence of an attorney/client relationship, however, liability could still exist in this case. We next turn to whether Cody owed a duty of care to the Bohns even though they were not his clients.

Traditionally, a rule of strict privity limited an attorney's liability for malpractice. Under this rule, a malpracticing

attorney could be held liable only to the attorney's own clients. *See Stangland v. Brock*, 109 Wn.2d 675, 680, 747 P.2d 464 (1987).

■ Privity of contract, however, is no longer required in all cases. Under certain circumstances, an attorney may be held liable for malpractice to a party the attorney never represented. Two theories provide the basis for this expanded liability. *Stangland*, at 680. First, an attorney may be held liable for negligence toward third party beneficiaries of an attorney/client relationship. *Stangland*, at 681; *Bowman v. John Doe*, 104 Wn.2d 181, 188, 704 P.2d 140 (1985). Second, an attorney may be held liable under a multifactor balancing test developed in California. This test involves analysis of the following six factors:

> the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury; the policy of preventing future harm; and the extent to which the profession would be unduly burdened by a finding of liability. The inquiry under this multi-factor test has generally focused on whether the attorney's services were intended to affect the plaintiff.

(Citations omitted.) *Stangland*, at 680; *see also Bowman*, at 187-88.

Under the multifactor test, genuine issues of material fact exist as to whether Cody owed a duty of care to the Bohns. Each factor of that test will be examined separately.

1. Intent to affect the Bohns. A reasonable factfinder could infer from the evidence that Cody intended to affect the Bohns when he discussed the consequences of the proposed security arrangement for the $50,000 loan. An inference can reasonably be drawn from the evidence that Cody only told a portion of the truth in order to increase the likelihood that the Bohns would loan the money to the Folletts.

2. Foreseeability of harm. A reasonable factfinder could also infer that Cody's misleading statements would foreseeably harm the Bohns. First, given Lucille Bohn's apparent

inexperience in financial affairs and given that she was lending money to her own daughter, it was certainly foreseeable that she would rely on Cody's statements about the fulfillment deed rather than seek verification elsewhere. Moreover, Cody was fully aware of the Folletts' recent financial difficulties, having represented them in at least two actions against their creditors. He knew that the Folletts had not been able to arrange conventional financing and that the IRS was having difficulties collecting payments from the Folletts in the year immediately preceding his misleading statements. Given this knowledge, a factfinder could find it foreseeable that Cody's statements would harm the Bohns.

3. Certainty of harm. The Bohns lost $50,000 — their life savings — in this transaction.

4. Proximity of harm. The Bohns' harm was proximately caused by the combination of the Folletts' failure to repay the money they borrowed and the failure of the fulfillment deed to provide any security. Based on the record so far developed in this case, we conclude that although Cody was not responsible for his clients' failure to repay the Bohns, he was directly responsible for the Bohns' reliance on the ineffective security and he had reason to know that the Folletts' financial situation was such that the security might actually be needed. Under these facts, Cody's conduct is proximately connected to the Bohns' harm.

5. Policy of preventing harm. This factor weighs strongly in favor of finding a duty. Based on the record so far developed in this case, we conclude the misleading nature of Cody's statements would justify imposing a duty of care, taking into account the amount of money here at stake, the foreseeability of the damages that the Bohns could suffer in this transaction, the foreseeability of their reliance, the familial relationship between the Folletts and the Bohns, and Lucille Bohn's express statements to Cody that she would make the loan only if she received absolute security. The policy of preventing harm under these circumstances is strong indeed.

6. Burden on the legal profession. Balanced against the importance of providing a remedy to those harmed by attorneys is the recognition that imposing liability could place an undue burden on practicing attorneys. Attorneys have a duty of zealously representing their clients within the bounds of the law. When their clients have opposing interests with third parties, attorneys are supposed to represent their clients' interests over the interests of others.

Imposing liability in the present case will not unduly burden an attorney's duty to represent his or her own clients. Under the extreme facts of this case, we hold simply that an attorney should advise the unrepresented party to seek independent counsel before the attorney discusses the transaction with that party. It was not enough in this case that Cody told Bohn that he was not acting as her attorney. This information does not sufficiently convey to the general public the adversarial stance an attorney must take toward those having interests different from the client's own interests. Moreover, if the attorney undertakes to tell part of the story to an unrepresented party with whom the attorney's client is doing business, the attorney must take reasonable steps to tell the whole story, not just the self-serving portions of it.

Because a duty could still exist between Cody and the Bohns, the Bohns' contract and negligence causes of action were improperly dismissed.

### III

One final aspect of this case remains. The trial court separately dismissed on summary judgment the Bohns' claim that Cody had violated DR 5-105 of the former Code of Professional Responsibility.[2] CPR DR 5-105 prohibits an attorney from accepting proffered employment, or from continuing multiple employment, if conflicts of interest are

---

[2]The Code of Professional Responsibility has since been replaced by the Rules of Professional Conduct.

likely to arise.[3] The Court of Appeals held that because Cody owed no duty at all to the Bohns, there could be no violation of the attorney discipline rules.

██ Cody now argues this claim should be dismissed for a different reason. He contends that violation of the attorney disciplinary rules cannot be used as a basis for malpractice liability. This argument, however, was not presented to the courts below and it has not been fully briefed in this court. We decline to address the issue under these circumstances. *See State v. McCormack*, 117 Wn.2d 141, 146 n.4, 812 P.2d 483 (1991).

In the courts below, Cody argued only that CPR DR 5-105 does not apply to a relationship between an attorney and a *nonclient*. We agree, at least in the context of this case. The former rule prohibits only two acts: accepting certain employments and continuing certain multiple employments. Because Cody did not accept employment with the Bohns, and never undertook multiple employment of the Bohns and the Folletts, he did not violate CPR DR 5-105. This claim was properly dismissed.

We affirm the dismissal of the third cause of action in the Bohns' complaint, but reverse the dismissal of the first two causes of action. We remand for further proceedings.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, SMITH, and GUY, JJ., concur.

After modification, further reconsideration denied June 22, 1992.

---

[3]The relevant portions of CPR DR 5-105 read as follows:
"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment . . ..
"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client . . .."