[No. 11611-3. En Banc.]
Argued May 11, 2004. Decided September 30, 2004.

*In the Matter of the Disciplinary Proceeding Against* PHILLIP E. EGGER, *an Attorney at Law.*

394

*Phillip E. Egger*, pro se.

*James L. Magee* and *Jeffrey A. Beaver* (of *Graham & Dunn, P.C.*), for petitioner.

*Scott G. Busby*, for the Bar Association.

BRIDGE, J. — Attorney Phillip Egger appeals from the Washington State Bar Association Disciplinary Board's (Board) recommendation that he be suspended from the practice of law for six months. The Washington State Bar Association's (WSBA) hearing officer concluded that Egger had committed misconduct arising out of his representation of Marietta Gudeman and recommended a one-year suspension. The Board agreed that Egger charged Gudeman an unreasonable fee in violation of RPC 1.5(a), and that he failed to disclose and get written consent to a potential conflict of interest in violation of RPC 1.7(b). In a split decision, the Board recommended a six-month suspension. Egger appealed to this court, arguing that various findings of fact are not supported by the evidence, that the resulting conclusions of law are erroneous, and that his sanction should be reduced to reprimand rather than suspension. The WSBA argues that the appropriate sanction is disbarment. We affirm the decision of the Board and impose a six-month suspension.

I

Statement of the Facts

Phillip Egger was admitted to the practice of law in 1981. In 1983 he became an associate with the Bellevue office of Williams, Kastner and Gibbs P.L.L.C. (Williams Kastner), and in 1989 he became a partner.[1]

In June 1987, Egger began representing Marietta Gudeman, an elderly German widow whose only child had

---

[1] Any unchallenged findings of fact, affirmed by the Board, are treated as verities on appeal. *In re Disciplinary Proceeding Against Brothers*, 149 Wn.2d 575, 582, 70 P.3d 940 (2003).

died in 1983. As of a 1986 valuation, her total assets were worth approximately $3.5 million and were generating an income of approximately $150,000 per year. Gudeman's assets had been invested in conservative, income-producing accounts, most of which were located in Germany and were managed by her longtime attorneys there.

In 1987 and 1988, Egger oversaw the transfer of Gudeman's investments to Rainier Bank trust accounts in Seattle. By August 1988, all of Gudeman's holdings had been transferred from Germany to the United States and Egger had power of attorney over Gudeman's person and assets. Egger then assisted Gudeman in making various investments and charitable donations, and he spent a significant amount of time with her outside of the office. The hearing officer found that during the course of the five-year lawyer-client relationship, "Mrs. Gudeman was a strong-minded and demanding person, but she was also very generous. She was very astute, she knew what she wanted, and she aggressively told people what she wanted and how she wanted it to be done." Hearing Officer's Finding of Fact (FOF) 3.149. However, in his oral findings, the hearing officer also concluded that Gudeman was particularly vulnerable because she was elderly, lived alone, English was her second language, and she was generous by nature. Moreover, even before Egger became involved with Gudeman both her lawyer and her financial adviser separately expressed concern regarding her dwindling ability to understand her investments.

Marsh Commons Loan: In early 1989 Egger signed a loan agreement on Gudeman's behalf, loaning more than $1 million to Marsh Commons, a condominium development in Kirkland, Washington.[2] The loan documents, prepared by Williams Kastner attorneys, provided that the borrower would pay the lender's legal fees up to $15,000. Egger billed Gudeman $21,000 for attorney fees and the costs incurred

---

[2] In 1991, the loan went into default and the project declared Chapter 11 bankruptcy.

in drawing up and closing the Marsh Commons loan. Marsh Commons paid $15,000 for legal fees, but the payment was not credited to Gudeman's account and she also paid the full $21,000 bill. Egger claims that upon the successful closing of the loan, Gudeman directed the firm to keep the $15,000.

Kuniholm Loan: About 1984, Gudeman developed a close relationship with Brigitte Kirkham, a real estate agent who lived and worked in the condominium building in which Gudeman resided. In 1986 or 1987 Kirkham began helping to manage Gudeman's financial affairs, and she would sometimes recommend that Gudeman pursue particular investments. At times, those investments also benefited Kirkham. For example, Kirkham received a $15,000 finder's fee as a result of the Marsh Commons loan.

In 1985, Kirkham[3] loaned $66,000 to Richard and Rena Kuniholm. In 1986, the Kuniholms filed for bankruptcy and Kirkham was listed as an unsecured creditor. Kirkham contacted Williams Kastner regarding the Kuniholm bankruptcy hearing and later testified that she believed the firm represented her during at least part of the Kuniholm bankruptcy matter. Kirkham did not recover the amount of her unsecured loan.

In 1989 Kirkham discussed with Gudeman the possibility of making a $300,000 loan to the Kuniholms, to be secured by the Kuniholms' Seattle home. In November of that year, while Kirkham was listed as a client in the Williams Kastner client records, Egger facilitated the loan. Egger wrote a letter to the Kuniholms' attorney, attempting to secure a cash payment to Kirkham of $66,000 to be paid out of the money loaned by Gudeman. Ultimately, however, Kirkham did not receive any of the loan proceeds from the Kuniholms.

Before the loan was completed, an associate at Williams Kastner wrote a memo to Egger, questioning whether

---

[3] The loan was from both Kirkham and her husband; however, it is the relationship between only Mrs. Kirkham and Gudeman that is of interest here.

Kirkham was a client and raising issues of actual and potential conflicts of interest involving the apparent representation of both Kirkham and Gudeman.

> A second problem is exactly whom we represent in this matter. If we represent Ms. Gudeman exclusively, then we should advise against entering into this transaction if its primary purpose is to permit the Kuniholms to use the loan proceeds to pay off Brigitte Kirkham's $60,000 to $70,000 claim against the Kuniholm estate. . . . We should consider writing a letter to our client(s) explaining these difficulties and warning her/them of the risks involved.

Ex. 62, at 1-2. The memo also expressed doubt, based on the firm's prior experience with the Kuniholms, as to whether Gudeman would benefit from making the loan. Egger claims that Gudeman understood that the loan to the Kuniholms would be used, in part, to repay the Kirkhams.

In 1992, Gudeman's family became concerned about her competency and her ability to handle her financial affairs. After discovering that Gudeman's liquid assets had been reduced to $84,000, diminishing her ability to pay for her own care, her grandson took over his grandmother's affairs and discharged Egger as her attorney. In 1994, Gudeman's grandson filed a civil suit against Egger, Williams Kastner, and Kirkham, alleging various tort claims. The litigation was settled for approximately $1 million, of which Egger paid approximately $28,000. Gudeman's grandson then filed a grievance with the WSBA.

## II

### Procedural History

In September 1999, the WSBA charged Egger with 19 counts of misconduct arising out of his relationship with Gudeman. Only counts 8 and 9 are at issue here. Count 8 charged Egger with "billing and collecting from Ms. Gudeman legal fees and costs incurred in preparing the Marsh Commons loan documents, when the loan docu-

ments specify that the borrower shall pay the costs of preparing the loan documents" in violation of RPC 1.5(a) (fees shall be reasonable). FOF 3. Count 9 charged Egger with "negotiating the Kuniholm loan, when the Kuniholms were in active bankruptcy, and when Brigitte Kirkham (one of the Kuniholm bankruptcy creditors) was a Williams Kastner client, without fully disclosing to Ms. Gudeman, nor obtaining her written consent to, the potential or actual conflicts of [interest] with the Kirkhams" in violation of RPC 1.7 (conflict of interest). *Id.*

A disciplinary hearing was held in 2000 and 2001. The hearing officer concluded that the WSBA had proved 6 of the 19 counts, including counts 8 and 9. With regard to count 8, the hearing officer found that Egger did not discuss with Gudeman that she was being charged for work that had already been paid for by the borrower. FOF 3.73. He also found that the total $36,000 fee was unreasonable in light of the work performed, and that Egger had "billed and collected from Ms. Gudeman legal fees and costs incurred in preparing the Marsh Commons loan documents, when the loan documents specify that the borrower shall pay the costs of preparing the loan documents, which actions violated RPC 1.5(a) (fees shall be reasonable)." FOF 3.75; Hearing Officer's Conclusion of Law (COL) 4.4. The hearing officer also determined that the "[c]ount 8 . . . violations were intentional and involved . . . violation of duties owed to the profession." Order Amending Decision at 2.

With regard to count 9, the hearing officer found that there was no credible evidence that Egger discussed with Gudeman the fact that Kirkham stood to benefit from the loan, nor was there evidence that Gudeman consented to making the loan with this knowledge. FOF 3.95, 3.96. Egger did not explain the potential for conflict to Gudeman in writing, and Gudeman never signed a written waiver of any actual or potential conflict. FOF 3.98; Ex. 148, at 4. In his oral ruling, the hearing officer explained that Egger's actions, including the letter to the Kuniholms' attorney requesting cash payment for the Kirkhams, amounted to

representation of the Kirkhams. Transcript (TR) (Oct. 5, 2001) at 15-16. The hearing officer noted that around November 1989 the firm was representing Kirkham and her family in other matters, and that a firm attorney had attended the Kuniholm bankruptcy hearing with Kirkham in 1986. *See id.* at 16; FOF 3.80. Finally, he emphasized that an associate at Williams Kastner had specifically called the potential conflict of interest to Egger's attention. TR (Oct. 5, 2001) at 16. Thus, the hearing officer concluded that Egger "negotiated the Kuniholm loan, when the Kuniholms were in active bankruptcy, and when Brigitte Kirkham (one of the Kuniholm bankruptcy creditors) was a Williams Kastner client, without fully disclosing to Ms. Gudeman, nor obtaining her written consent to the potential or actual conflicts of [interest] with the Kirkhams." COL 4.5. He also determined that the count 9 violation was "knowingly committed." Order Amending Decision at 2.

After a separate hearing to consider aggravating and mitigating circumstances and the appropriate sanction, the hearing officer recommended that Egger be suspended from the practice of law for one year. Hearing Officer's Recommendation for Sanctions at 1; TR at 2807-10. Both Egger and the WSBA appealed to the Board. Disciplinary Board Order at 1. The Board concluded "that the record . . . prove[d] Counts 8 and 9 only and that the appropriate sanction is a six-month suspension." *Id.* The Board applied the American Bar Association's *Standards for Imposing Lawyer Sanctions* stds. 4.12, 4.32 (1991 ed. & 1992 Supp.) (*Standards*) to Egger's misconduct and found that in both cases Egger's conduct was knowing rather than intentional. Disciplinary Board Order at 3. The Board concluded that the aggravating and mitigating factors found by the hearing officer did not provide a reason to deviate from the presumptive sanction and recommended a six-month suspension.[4] *Id.* at 4.

---

[4] Although there was no disagreement as to the finding that Egger committed counts 8 and 9, several members dissented as to the appropriate sanction. A six-member majority voted for the recommended six-month suspension, one

Before this court, Egger challenges the hearing officer's findings of fact and conclusions of law on counts 8 and 9. Egger also contends that the hearing officer and Board erroneously found that his misconduct in connection with the Kuniholm loan was knowing rather than negligent.[5] Both Egger and the WSBA contend that the Board misapplied the *Standards* when determining the presumptive sanction; Egger argues that his sanction should be only reprimand, while the WSBA argues that the proper sanction is disbarment.

## III

## Analysis

 This court bears the ultimate responsibility for lawyer discipline in Washington. *In re Disciplinary Proceeding Against Cohen*, 150 Wn.2d 744, 753, 82 P.3d 224 (2004) (*Cohen* II). However, we give considerable weight to the hearing officer's findings of fact, so long as they are supported by a clear preponderance of the evidence. *In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 717, 72 P.3d 173 (2003); *In re Disciplinary Proceeding Against Miller*, 149 Wn.2d 262, 276-77, 66 P.3d 1069 (2003). We will also uphold the hearing officer's conclusions of law if they are supported by the findings of fact. *Cohen* II, 150 Wn.2d at 754. Generally, we give greater weight to the Board's sanction recommendation than we give to the hearing officer's, and although we are not bound by the Board's recommendation, we recognize that as " ' " 'the only body to hear the full range of disciplinary matters,' " ' " the Board has " ' " 'unique experience and perspective in the administration of sanctions.' " ' " *Id.* (quoting *In re Disciplinary*

dissenting member would have approved a three-month suspension, and three additional dissenting members "would have approved a sanction of suspension" of unknown length. Clarification of Decision at 1. Finally, one dissenting member would have approved a sanction less than suspension. Disciplinary Board Order at 1. Thus, 10 of the 11 Board members would have approved a suspension.

[5] The hearing officer found Egger's conduct to be intentional, and the Board found it to be knowing. Thus, both agreed that his conduct was at least knowing.

*Proceeding Against Anschell*, 141 Wn.2d 593, 607, 9 P.3d 193 (2000) (*Anschell* I) (quoting *In re Disciplinary Proceedings Against Dann*, 136 Wn.2d 67, 84, 960 P.2d 416 (1998) (quoting *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 94, 667 P.2d 608 (1983)))). "We should not lightly depart from recommendations shaped by this experience and perspective." *Noble*, 100 Wn.2d at 94.

Count 8—Unreasonable Fee

Findings of Fact: Egger contends that the findings of fact for count 8 are not supported by a clear preponderance of the evidence. The hearing officer found that Egger billed and collected from Gudeman the full $21,000 in legal fees and costs incurred in preparing the Marsh Commons loan documents. FOF 3.68. Egger did so despite the fact that the documents specified that the borrower's $15,000 payment was to be applied toward the lender's legal expenses. *Id.* The hearing officer also found that Egger did not discuss with Gudeman that she was being charged for work that was already paid for by the borrowers, and that she did not knowingly consent to such an arrangement. FOF 3.73, 3.74. Egger claims, however, that the only evidence as to Gudeman's understanding of the fee arrangement was his own testimony that she wanted the firm to keep both payments, and that even if the hearing officer did not believe this testimony, there is no other evidence in the record to support the conclusion that Gudeman did not know about or approve of the double payment of the fees. TR at 1173. Egger claims that Gudeman's payment of the full $21,000 must mean that she did not intend the borrower's $15,000 payment to be credited to her account.

▮▮▮ The hearing officer's findings of fact are given considerable weight so long as they are supported by a clear preponderance of the evidence, which requires greater certainty than a simple preponderance of the evidence, but less than proof beyond a reasonable doubt. *In re Disciplinary Proceeding Against Allotta*, 109 Wn.2d 787, 792, 748

P.2d 628 (1988). The mere presence of conflicting evidence in the record is not enough to overturn a hearing officer's findings and we ordinarily will not disturb unanimously approved findings of fact made upon conflicting evidence. *See In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 813, 72 P.3d 1067 (2003); *In re Disciplinary Proceeding Against Huddleston*, 137 Wn.2d 560, 568, 974 P.2d 325 (1999). Mere restatement of the challenger's version of the facts is not enough. *See Kagele*, 149 Wn.2d at 814; *In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 861, 64 P.3d 1226 (2003). We will not substitute our evaluation of the credibility of witnesses for that of the hearing officer. *Miller*, 149 Wn.2d at 277.

Although Egger asserts that the hearing officer relied *only* upon the fact that he did not believe Egger's testimony, Egger ignores other evidence in the record that supports the hearing officer's findings. Though neither party presented a written fee agreement between Egger and Gudeman, the loan document provides evidence as to the fee arrangement: it clearly states that "Borrowers shall pay *Lender's* reasonable fees and expenses . . . including . . . reasonable fees of legal counsel engaged by Lender; provided . . . that legal fees through closing of the Loan shall not exceed $15,000." Ex. 57, Loan Agreement at 10 (emphasis added). In addition, Egger testified that Gudeman was billed for the Marsh Commons work at the firm's hourly rates and that the total fee amounted to $21,000, not $36,000. Egger's Opening Br. at 6; TR at 1173; FOF 3.68. The language of the loan agreement and Egger's own explanation of the bill provide evidence that the $15,000 payment from the borrowers should have been credited toward a total $21,000 fee.

■ Egger claims that when the loan closed, Gudeman instructed him to "keep the $15,000 fee from the developers in recognition of the firm's efforts on her behalf," testimony that the hearing officer found not credible. Egger's Opening Br. at 6. Egger presents only the fact that Gudeman actually paid the $21,000 fee without protest to support this

claim. Yet, this court has clearly recognized that a client's acquiescence to an unreasonable fee does not absolve misconduct. *See In re Disciplinary Proceeding Against Boelter*, 139 Wn.2d 81, 97, 985 P.2d 328 (1999); *Dann*, 136 Wn.2d at 79 n.2 ("where clients themselves did not come forward to complain about Dann's billing practices, that fact does *not* provide circumstantial evidence rebutting the misconduct charges."). Therefore, the fact that Gudeman paid the full $21,000 fee cannot be relied upon to support Egger's contentions. In sum, the language of the loan agreement and Egger's own statements regarding the bill support the hearing officer's findings. Only Egger's testimony contradicts this evidence, and the hearing officer did not believe that testimony. Because a review of the record does not justify reversal of the unanimously adopted findings of fact, we uphold the hearing officer's findings as to count 8.

Conclusion of Law—RPC 1.5 Violation: Egger contests the hearing officer's conclusion of law, unanimously approved by the Board, that the fee Gudeman paid for the Marsh Commons loan was unreasonable and in violation of RPC 1.5(a). Egger argues that the total $36,000 payment for the Marsh Commons matter was reasonable in light of the loan documents created and the work performed, despite the double payment discussed above.

We will uphold the hearing officer's and Board's conclusions of law if they are supported by the findings of fact. *Cohen* II, 150 Wn.2d at 754. RPC 1.5(a) states that a lawyer's fees must be reasonable. Various factors are considered in evaluating the reasonableness of a fee, including: the time, labor, and skill required; the novelty and difficulty of the work; the terms of a fee agreement; the likelihood that the work will preclude other employment; the fee customarily charged for similar services; the amount at stake for the client and the results obtained; the time limitations for completing the work; the nature and length of the relationship between the attorney and the client; the experience, ability, and reputation of the lawyers performing the work; and "[w]hether the fee agreement or confirm-

ing writing demonstrates that the client had received a reasonable and fair disclosure of material elements of the fee agreement and of the lawyer's billing practices." RPC 1.5(a)(1)-(8).

Egger claims that the hearing officer did not carefully consider these factors and that he ignored expert testimony and evidence that the Marsh Commons loan documents were of first-rate quality and involved a voluminous amount of work. Egger's Opening Br. at 13 (citing TR at 2523, 2561-62, 1275). Moreover, he contends the results of the loan were positive for Gudeman. *Id.* at 14 (citing TR at 1650, 2537). Egger asserts that this evidence weighs in favor of reasonableness.

Neither Egger nor the WSBA has presented a written fee agreement. However, the fact remains that the firm billed Gudeman $21,000 for the Marsh Commons work. Egger's Opening Br. at 6 (citing FOF 3.68). Egger offers nothing to contradict the reasonable conclusion that the amount actually billed in this case reflects: the time and labor required; the novelty and difficulty of the work; the likelihood that the work precluded other employment; the fee customarily charged for similar services; the amount at stake; the time limitations; the nature and length of the relationship between Williams Kastner and Gudeman; and the experience, ability, and reputation of the lawyers who performed the work. *See* RPC 1.5(a). Therefore, under the unique facts of this case, we conclude that a reasonable fee for the work performed was the $21,000 billed and that the parties actually paid an additional $15,000; Egger was paid twice for the same work. Considering all of the 1.5(a) factors, it is reasonable to conclude that the $36,000 ultimately collected amounted to an unreasonable fee. We therefore uphold the hearing officer's conclusion, affirmed by the Board, that Egger charged an unreasonable fee.

### Count 9—Conflict of Interest

Egger challenges the hearing officer's findings of fact and conclusions of law, both of which were upheld by

the Board, with regard to count 9. RPC 1.7(b) states:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person . . . unless:
>
> (1) The lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) The client consents in writing after consultation and a full disclosure of the material facts . . . .

To determine whether Egger violated this rule, this court must first establish whether Kirkham was a client to whom Egger had responsibilities at the time of the Kuniholm loan. If so, we must then decide whether Egger complied with the rule.

Findings of Fact: The hearing officer found that Egger negotiated the $300,000 Kuniholm loan and then made efforts to secure $66,000 as payment to the Kirkhams. FOF 3.94. He also found that there was no evidence that Egger ever discussed with Gudeman that Kirkham stood to benefit from the loan, nor was there any evidence that Gudeman consented to making the loan with the knowledge that Kirkham would benefit. FOF 3.94-3.96. Moreover, there was no written waiver of any actual or potential conflict of interest with regard to the Kuniholm loan. FOF 3.98. The hearing officer concluded that because Gudeman and the Kirkhams were both clients at the time, and because Egger failed to fully disclose to Gudeman the actual or potential conflicts involved, Egger violated RPC 1.7 (conflicts of interest). *See* COL 4.5.

Egger challenges the findings of fact supporting count 9. First, Egger claims that the hearing officer incorrectly found that Kirkham was a client at the time of the Kuniholm loan in November 1989. But while Kirkham was found not to be a client in 1987 or 1988, the hearing officer concluded that by attempting to secure payment to Kirkham of $66,000 out of the Kuniholm loan, Egger was

acting as Kirkham's attorney in 1989.[6] He also noted that at the time of the loan Kirkham was listed as a client in Williams Kastner records with regard to several matters. TR at 896-97; Ex. 155.[7] Finally, an associate's memo questioned whom the firm was representing in the Kuniholm matter and indicated that Gudeman and Kirkham could both be considered clients with regard to the loan. Ex. 62.

Determining whether Kirkham was a Williams Kastner client at the time of the Kuniholm loan necessarily involves questions of fact. *See Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992). The hearing officer's finding that Kirkham was a client was unanimously approved by the Board. We will uphold the hearing officer's findings of fact, even if there is conflicting evidence in the record, unless they are not supported by a clear preponderance of the evidence. *Whitt*, 149 Wn.2d at 717; *Huddleston*, 137 Wn.2d at 568.

This court has held that the essence of the attorney-client relationship is whether the attorney's assistance or advice is sought and received on legal matters. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 306, 45 P.3d 1068 (2002); *Bohn*, 119 Wn.2d at 363. An attorney-client relationship may be implied from the parties' conduct; it need not be memorialized in writing. *Bohn*, 119 Wn.2d at 363. Whether or not a fee is paid is not dispositive, for "[t]he existence of the [attorney-client] relationship 'turns largely on the client's subjective belief that it exists.' " *Id.* (quoting *In re Disciplinary Proceeding Against McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983)). However, the subjective belief must be "reasonably formed based on the attending circumstances, including the attorney's words or

---

[6] "You wrote—Exhibit 61, which was a letter to Attorney Snodgrass as seeking cash payoff for Brigitte Kirkham of this $66,000 loan that Brigitte had made to the Kuniholms. Again, looks like, walks like, talks like you were representing Brigitte Kirkham, and you were asking for her to be paid off in cash." TR (Oct. 5, 2001) at 16-17.

[7] The firm created a client number for Kirkham in 1989 and records show that three matters were opened for her in February 1989, one with Brigitte listed as a party. Two other matters were opened in August 1989 with Brigitte listed as a party. *See* Ex. 155.

actions." *Id.*[8] Finally, RPC 1.10 imputes conflicts under RPC 1.7 to all members of an attorney's firm. RPC 1.10(a).

Egger's actions on Kirkham's behalf, her presence on Williams Kastner's client roster, and the associate's memo to Egger provide substantial evidence to support the finding that Kirkham was a client in November 1989. Although Egger relies on the fact that Kirkham was not billed until 1990, this does not necessarily indicate the absence of an attorney-client relationship in 1989. *See Bohn*, 119 Wn.2d at 363. Additionally, Kirkham's subjective belief that an attorney-client relationship existed is evidenced by the fact that Williams Kastner's records list her as a client in connection with specific cases. She must have at least discussed these matters with someone at the firm before a file could be opened, which would presumably lead her to believe that she was represented by the firm. *See* Ex. 155. Given this evidence, we conclude that Williams Kastner represented Kirkham at the time of the Kuniholm loan.

In an additional challenge to the hearing officer's findings of fact, Egger claims that there is no affirmative evidence to suggest that Gudeman was unaware of the benefit that Kirkham would receive from the loan. Egger's Opening Br. at 17. He argues that the WSBA bears the burden to prove that Gudeman was unaware of a potential conflict; however, Egger ignores the requirement of RPC 1.7(b) that a lawyer must obtain informed consent *in writing* to the actual or potential conflict. RPC 1.7(b)(2). Egger has admitted that he did not obtain Gudeman's written consent. Ex. 148, at 4. Therefore, we affirm the hearing officer's findings of fact, approved by the Board, that Egger did not obtain any written waiver of potential conflicts with regard to the Kuniholm matter.

Conclusion of Law—RPC 1.7 Violation: Egger argues that the hearing officer and the Board incorrectly concluded that he violated RPC 1.7 (conflicts of interest). RPC 1.7(b)

---

[8] In *Bohn*, this court held that an attorney-client relationship did not exist where the attorney made it clear at the outset that he could not act as Bohn's attorney. 119 Wn.2d at 363-64.

requires that an attorney refrain from representing a client if the representation of the client may be materially limited by the lawyer's responsibilities to another client or a third person, unless the lawyer reasonably believes the representation will not be materially affected and the client consents in writing after full disclosure. This court must uphold the hearing officer's and Board's conclusion of law that Egger violated RPC 1.7 if such conclusion is supported by the findings of fact. *Cohen* II, 150 Wn.2d at 754.

Egger first claims that the loan would benefit both women and that this alignment of their interests precludes a finding that a conflict existed. However, RPC 1.7(b) applies even absent a direct conflict. The hearing officer justifiably concluded that Egger's representation of Gudeman could have been materially affected by his responsibilities to Kirkham. *See Eriks v. Denver*, 118 Wn.2d 451, 824 P.2d 1207 (1992) (holding that representation of both the promoters of and investors in a tax shelter scheme was a breach of fiduciary duty to investor clients). On a similar note, Egger claims that no conflict of interest exists where a client wishes to confer a direct benefit on a third party. However, this argument assumes facts that the hearing officer expressly rejected when he found that there was no evidence that Gudeman knew Kirkham stood to benefit from the loan to the Kuniholms. *See* FOF 3.95-3.98; *Miller*, 149 Wn.2d at 277 (we will not substitute our evaluation of the credibility of witnesses over that of the hearing officer's). Therefore, we affirm the hearing officer's conclusion, upheld by the Board, that by failing to obtain a written waiver of the potential conflict of interest, Egger violated RPC 1.7(b). Such a conclusion is supported by the findings of fact.

## Sanction

The *Standards* govern lawyer sanctions in Washington. *Cohen* II, 150 Wn.2d at 758. We first evaluate whether the Board properly determined the presumptive

sanction by considering (1) the ethical duties violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct. *Id.; see also* STANDARDS std. 3.0(a)-(c). Next we consider whether the hearing officer and the Board properly weighed aggravating and mitigating circumstances. STANDARDS std. 3.0(d). Finally, we determine whether the degree of unanimity among Board members and proportionality of the sanction justify departure from the Board's recommendation. *In re Disciplinary Proceeding Against Kuvara,* 149 Wn.2d 237, 259, 66 P.3d 1057 (2003). Where recommendations differ, we will generally give more weight to the Board's sanction recommendation than the hearing officer's, based on the Board's unique experience and perspective in the administration of sanctions. *Cohen II,* 150 Wn.2d at 754.

Presumptive Sanction Count 8: Both parties agree that standard 7.0 should be applied to determine the appropriate sanction for charging an unreasonable fee. *See In re Disciplinary Proceeding Against Brothers,* 149 Wn.2d 575, 585, 70 P.3d 940 (2003); *In re Disciplinary Proceeding Against Cohen,* 149 Wn.2d 323, 337, 67 P.3d 1086 (2003) (*Cohen* I). The applicable subsection of standard 7.0 depends upon Egger's state of mind. The WSBA argues that the hearing officer was correct when he concluded, without explanation, that Egger acted intentionally in double-billing Gudeman for the Marsh Commons work. The Board found instead that Egger acted knowingly, a conclusion that Egger does not challenge. The *Standards* define "intent" as "the conscious objective or purpose to accomplish a particular result," and "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." STANDARDS, Definitions at 7.

In order to support its argument that Egger acted intentionally, the WSBA refers to an early allegation that Egger had engaged in a practice of excessive billing, but the hearing officer clearly rejected that claim. The WSBA also asserts that Egger collected the $15,000 fee in order to

benefit himself and his firm. However, all excessive fees ultimately benefit the attorney or firm who charges them, yet we have not found that all excessive fees amount to intentional misconduct. *See Cohen* I, 149 Wn.2d at 335 (improper fee was charged knowingly); *Brothers*, 149 Wn.2d at 585 (attorney acted knowingly when he charged a large fee for a minor matter). Therefore, we affirm the Board's conclusion that Egger acted knowingly.

 Standard 7.2 states that "[s]uspension is generally appropriate when a lawyer *knowingly* engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." (Emphasis added.) Neither party disputes that the excessive fee caused injury. Because Egger acted knowingly, suspension is the most appropriate presumptive sanction for Egger's violation of RPC 1.5(a).

Egger argues that standard 7.3 (reprimand) should be applied instead of standard 7.2 (suspension). Standard 7.3 states that reprimand is appropriate when a lawyer *negligently* engages in conduct violating a duty as a professional and causes injury or potential injury. Although he does not contest that he acted with knowledge, Egger relies on the standard 7.3 Commentary, which states that "[c]ourts typically impose reprimands when lawyers engage in a single instance of charging an excessive or improper fee." However, this court has applied standard 7.2, rather than standard 7.3, in cases involving single instances of excessive billing when the attorney acted knowingly. *See Brothers*, 149 Wn.2d at 585; *Cohen* I, 149 Wn.2d at 337.[9] Therefore, Egger's argument for deviating from standard 7.2 is unconvincing. We conclude that the presumptive sanction for count 8 is suspension.

---

[9] In *Brothers*, this court imposed a one-year suspension under standard 7.2 where Brothers was charged with knowingly collecting more than $36,000 in a single fee for what amounted to the filing of a quitclaim deed. *Brothers*, 149 Wn.2d at 585, 588. Although we noted that Brothers had recently returned another large fee, we were imposing discipline in that case only for the single fee violation that was charged. In *Cohen* I, this court applied standard 7.2 where Cohen knowingly charged his clients $3,000 for an appeal even though the appeal was necessitated solely by his own misconduct. *Cohen* I, 149 Wn.2d at 337.

Presumptive Sanction Count 9: Egger asserts that the hearing officer and the Board incorrectly concluded that he acted knowingly in regard to count 9. The parties agree that standard 4.3 (failure to avoid conflicts of interest) is the appropriate standard for a violation of RPC 1.7, but they disagree as to whether standard 4.32 or 4.33 applies. Standard 4.32 explains that "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." In contrast, standard 4.33 states that "[r]eprimand is generally appropriate when a lawyer is negligent in determining . . . whether the representation [of a client] will adversely affect another client, and causes injury or potential injury to a client." Both the hearing officer and the Board concluded that Egger acted knowingly with regard to this count, and the Board applied standard 4.32. However, Egger claims that he acted only negligently.

Again, the *Standards* define knowledge as "the conscious awareness of the nature or attendant circumstances of the conduct" while they define negligence as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." STANDARDS, Definitions at 7. Significantly, the hearing officer found that an associate at Williams Kastner wrote Egger a memorandum that raised the issue of conflicts of interest between Gudeman and Kirkham. FOF 3.86. Moreover, the memorandum noted that Egger's advice should differ depending upon which party or parties the firm represented. FOF 3.87. Egger did not challenge these findings of fact, which demonstrate that he received express notice that his representation could be materially affected based on whom the firm was representing. *See* RPC 1.7(b). It would be contrary to these findings of fact to conclude that Egger acted without conscious awareness of the nature or attendant circumstances of his conduct.

Egger nevertheless argues that his misconduct is more comparable to cases in which we have found negligent conduct than it is to cases in which we have found knowing conduct. In doing so, he seems to argue that an attorney must know that his conduct *violates the RPCs* for it to be considered knowing under the *Standards*. Although this may have been a factor in one case, *In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 604, 48 P.3d 311 (2002), the definition of knowledge contains no such requirement and this court has found knowledge where an attorney knew *or should have known* that a conflict existed. *See, e.g., In re Disciplinary Proceeding Against Gillingham*, 126 Wn.2d 454, 466, 896 P.2d 656 (1995). Moreover, this court has found knowing conduct even where the attorney claimed a matter " ' "fell through the cracks." ' " *Cohen I*, 149 Wn.2d at 335 (quoting *Anschell I*, 141 Wn.2d at 610 (quoting Anschell Br. at 5-6)). Therefore, consciousness that particular conduct violates the RPCs is not a prerequisite for a finding of knowledge.[10] Here, the findings of fact amply support the hearing officer's conclusion, adopted by the Board, that Egger knowingly failed to disclose to Gudeman that his representation of her could be materially limited by his representation of and responsibilities to Kirkham.

The language of standard 4.32 makes it clear that suspension is the appropriate sanction where an attorney acted with knowledge. However, Egger also argues that standard 4.33 (imposing reprimand) is more applicable

---

[10] Furthermore, a finding of knowledge in this case does not conflict with *McKean*, 148 Wn.2d at 872. In that case this court found that McKean acted *at least* negligently because he should have known that a conflict existed when he loaned one client's money to another client, a company in which he had an interest. *Id.* In the instant case, Egger was actually alerted to the existence of a potential conflict. Therefore, a finding of knowledge here is not inconsistent with *McKean*. For the same reasons, this case is distinguishable from *Carmick*, 146 Wn.2d at 604 (recognizing that an attorney could have incorrectly believed that the circumstances would have allowed him to contact an opposing party), and *Gillingham*, 126 Wn.2d at 463 (finding negligence where the attorney complied roughly with the spirit of the RPCs and evidence of the attorney's negligent state of mind was apparent in the record). Here, the associate attorney's memo alerted Egger to the conflict issue, making him aware of the nature and attendant circumstances of his conduct.

than standard 4.32 because his violation is more like those to which this court has applied standard 4.33. Egger claims that application of standard 4.32 is limited to instances where an attorney acted in his own self-interest. Egger's Opening Br. at 30 (citing *In re Disciplinary Proceeding Against Johnson*, 118 Wn.2d 693, 826 P.2d 186 (1992) (imposing suspension for failure to adequately disclose conflict when lawyer borrowed money from client); *In re Disciplinary Proceeding Against McMullen*, 127 Wn.2d 150, 896 P.2d 1281 (1995) (same); *Gillingham*, 126 Wn.2d at 466 (imposing suspension where attorney should have recognized conflict of interest inherent in drafting a will for a client naming himself as a beneficiary)). In contrast, Egger notes that this court applied standard 4.33 in *McKean*, 148 Wn.2d at 872 (concluding that McKean should have known there was a conflict involved in lending one client's money to another client). However, the language of standard 4.32 does not limit its application to instances where misconduct was self-serving; instead, application of standard 4.32 depends upon a finding of knowledge and in *McKean*, there was no such finding. More importantly, this court has applied standard 4.32 where the attorney failed to adequately disclose a conflict between a former and a current client. *See In re Disciplinary Proceeding Against Anschell*, 149 Wn.2d 484, 492-94, 510-11, 69 P.3d 844 (2003) (*Anschell II*). We are just as willing to apply standard 4.32 where the conflict involves two current clients. Thus, the proposed distinction based on the attorney's self-interest does not comport with the language of the *Standards* nor this court's case law.

Egger also argues that the standard 4.33 Commentary indicates that it should be applied when a lawyer engages in a single instance of misconduct involving a conflict of interest. However, this court has applied standard 4.32 in such circumstances. *See, e.g., Anschell* II, 149 Wn.2d at 510 (applying standard 4.32 for a single instance of failing to adequately disclose a conflict between a current and a former client); *McKean*, 148 Wn.2d at 871 (applying stan-

dard 4.32 for a single conflict violation involving entering into a business transaction with a client).

Finally Egger argues that standard 4.33 (reprimand) should be imposed because his conduct was no more serious than cases in which this court has imposed reprimand in the past. He points to *McKean*, 148 Wn.2d at 872 (imposing reprimand where McKean lent one client's money to another client without full disclosure and he acted "at least" negligently), *In re Disciplinary Proceeding Against Donohoe*, 90 Wn.2d 173, 175-76, 580 P.2d 1093 (1978) (imposing censure for failure to disclose conflict in representing both a judgment creditor and a judgment debtor), and *McGlothlen*, 99 Wn.2d at 526-27 (imposing no sanction where attorney's conduct was "borderline," but explaining that the court would not be so lenient in the future). However, *Donohoe* and *McGlothlen* occurred before we began applying the *Standards* in imposing lawyer sanctions, and there was no finding of knowledge in *McKean*, precluding application of standard 4.32 in that case. Finally, this court has previously applied standard 4.32 where the attorney knowingly failed to adequately disclose a conflict between a current client and a former client. *Anschell* II, 149 Wn.2d at 492-94, 510-11. Thus, that standard should apply equally where a conflict existed between two current clients. In sum, none of the cases cited above justifies applying standard 4.33 instead of standard 4.32 where the hearing officer and Board have concluded that the attorney acted with knowledge. We thus conclude that the presumptive sanction for count 9 is suspension.

 Aggravating and Mitigating Circumstances: In his oral ruling, the hearing officer identified various aggravating factors, including: substantial experience in the practice of law, pattern of misconduct, multiple offenses, vulnerability of the victim, and lack of remorse. TR at 2807-08. The hearing officer reported that he gave great weight to Gudeman's vulnerability. TR at 2808. Because many of the hearing officer's conclusions of law as to counts not at issue here were overturned by the Board, "pattern of

misconduct" and "multiple offenses" can no longer be considered aggravating factors. The WSBA asserts that the record clearly supports a finding of dishonest or selfish motive but fails to provide citations to the record or further discussion to support such a claim. Thus, the factors of substantial experience in the practice of law, vulnerability of the victim, and lack of remorse remain.

The hearing officer also found various mitigating factors, including: lack of prior or subsequent disciplinary history, evidence of good character or reputation, remoteness of the offenses, and delay in the proceedings. Egger argues that the court should depart downward from the recommended sanction, but he does nothing more than note the existence of some of the mitigating factors to support this argument. Egger's Reply Br. at 24. Neither party has presented a convincing reason for deviating from suspension based on aggravating and mitigating factors. As such, we uphold the Board's conclusion that aggravating and mitigating factors do not justify a departure from the presumptive sanction.

 Unanimity and Proportionality: The hearing officer recommended a one-year suspension for six violations of the RPCs. The Board concluded that only two violations occurred and reduced the suspension to six months, which is generally the minimum suspension imposed. *See, e.g., Standards* std. 2.3; *Cohen* II, 150 Wn.2d at 762. This court can depart from the Board's recommended sanction based on relative unanimity of the Board vote and proportionality of the sanction.

Ten of the Board members recommended suspension, while only one voted for a sanction less than suspension. Six voted for a six-month suspension, one voted for a three-month suspension, and three voted for a suspension of unknown length. Egger argues that the Board vote allows us to depart downward from the recommended six-month suspension. While we know that two members would have imposed a lighter sanction, we unfortunately do not know whether the three "unknown length" voters would have expanded or shortened the recommended suspension.

Therefore, the dissenting Board votes do not weigh in favor of either an upward or downward departure.

■■ Proportionality: "Under proportionality review, we analyze whether a presumptive sanction is proper by comparing the case at hand with other similarly situated cases in which the same sanction was approved or disapproved." *Miller*, 149 Wn.2d at 285. An attorney facing discipline bears the burden of bringing cases to the court's attention to persuade us that the recommended sanction is disproportionate. *Kagele*, 149 Wn.2d at 821. Neither Egger nor the Board discusses the proportionality factor. Therefore, neither unanimity nor proportionality justifies departure from the sanction recommended by the Board.

## IV

## Conclusion

The hearing officer and Board properly concluded that Phillip Egger committed two counts of misconduct. He charged an unreasonable fee when he billed a client for work that had already been paid for, at least in part, by a third party pursuant to a loan agreement. He also failed to obtain his client's written consent to a potential conflict of interest. He acted knowingly in both instances, and the presumptive sanction in both cases is suspension. Aggravating and mitigating factors, unanimity, and proportionality do not support variation from the presumptive sanction. Therefore, this court imposes the Board's recommended suspension of six months.

ALEXANDER, C.J.; JOHNSON, MADSEN, SANDERS, IRELAND, CHAMBERS, and OWENS, JJ.; and BAKER, J. Pro Tem., concur.

Reconsideration denied December 1, 2004.