IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| EAKIN ENTERPRISES, Inc., a | ) | No. 36316-3-III |
| Washington Corporation; JOHN W. | ) | |
| EAKIN, a single person, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STRATTON BALLEW, PLLC, a | ) | |
| Washington Professional Limited Liability | ) | |
| Company; SVENDSEN LEGAL, LLC, a | ) | UNPUBLISHED OPINION |
| Washington Limited Liability Company; | ) | |
| CHRIS E. SVENDSEN and "JANE DOE" | ) | |
| SVENDSEN, husband and wife, and the | ) | |
| marital community composed thereof; | ) | |
| STRATTON LAW & MEDIATION, P.S., | ) | |
| a Washington Professional Services | ) | |
| Corporation; REX B. STRATTON and | ) | |
| "JANE DOE" STRATTON, husband and | ) | |
| wife and the marital community composed | ) | |
| thereof; PATRICK H. BALLEW, a single | ) | |
| person, | ) | |
| | ) | |
| Respondents. | ) | |

No. 36316-3-III
*Eakin Enterprises, Inc. v. Stratton Ballew, PLLC*

FEARING, J. — On cross motions for summary judgment in this attorney malpractice suit, the client and attorney disputed whether the parties had entered an attorney-client relationship at the time of the attorney's purported failure to properly advise the client. The trial court ruled that the parties had not yet entered the attorney-client relationship, and the court thereby granted the attorney summary judgment dismissal of one of several claims of malpractice. We take the unusual step of reversing based on factual uncertainty. We remand for further proceedings on the basis that the parties failed to fully develop and present important facts needed to resolve the issue on summary judgment, assuming the issue should be resolved summarily. We also rule that the trial court properly certified, for immediate review by this court, the grant of the partial summary judgment dismissal in favor of the attorney.

FACTS

This case deals with alleged attorney malpractice stemming in part from an attorney's failure to warn an ostensible client against use and public display of an invention before the client's application for a patent. We borrow our facts from summary judgment declarations, deposition testimony of the parties, and a declaration of an expert witness.

2

In 2004, plaintiff John Eakin began developing a cattle footbath used to bathe dairy cows' hoofs before milking. The footbath system applies a concentration of formaldehyde into a basin through which cows walk, and the formaldehyde cleans and sterilizes the feet. The bath prevents or kills fungi and bacteria from settling in the tissue of hooves. Eakin modified the invention over the years. We refer to the various formulations of the invention as "first prototype," "second prototype," and "third prototype."

In 2005, John Eakin finished his first prototype. In November 2005, Eakin displayed the inaugural prototype at the annual Dairymen's Show in Boise. This prototype proved unsuccessful because undiluted formaldehyde splashed workers operating the footbath as the formaldehyde flowed from a storage tank into the basin. Formaldehyde emanates noxious and harmful fumes.

In early 2006, John Eakin fashioned his second prototype of the cattle footbath, the prototype that is the subject of this appeal. The second prototype included two improvements, a meter that regulated the amount of flow of the formaldehyde added to the basin of the footbath and a check valve that vented fumes into the air. In summer 2006, a dairy commercially operated the second prototype.

A principal question on appeal surrounds when John Eakin and defendant Chris Svendsen formed an attorney-client relationship such that Svendsen owed a duty of care

to Eakin. John Eakin informed his friend, attorney Wes Gano, of his invention. Gano

suggested that Eakin speak to patent attorney Chris Svendsen about procuring a patent.

On August 2, 2006, John Eakin telephoned Chris Svendsen of Stratton Ballew,

PLLC. According to Chris Svendsen, Eakin said "he was working on a system for a

'better' [cattle] foot-bath system and that he would keep [Mr. Svendsen] posted on its

development." Clerk's Papers (CP) at 488. Further, according to Svendsen, Eakin told

Svendsen "to wait to hear back from him." CP at 488. In a deposition, John Eakin

corroborated that he continued to work on the footbath invention at the time of his first

call to Svendsen.

According to Chris Svendsen, he asked few questions of John Eakin during the

initial phone call on August 2, 2006, because Svendsen needed to perform a client

conflicts check. Svendsen avers that he provided no legal advice during the call.

Svendsen references the August 2 phone call as a "'screening interview'" and refuses to

label the phone conversation as an "'initial interview.'" CP at 488. Svendsen insists that

he needed to limit the questions asked Eakin before completing the conflicts check.

We do not know if John Eakin and Chris Svendsen informed the court as to the

full extent of the conversation on August 2. Nevertheless, during the August 2006 phone

call, Chris Svendsen did not ask Eakin questions about the status of development of the

invention or whether Eakin had publicly displayed or allowed use of the invention as it then existed. According to Svendsen, questions of prior use or display should not be asked during this screening interview. Svendsen did not ask Eakin if he had any plans in the foreseeable future to publicly display or use the invention. Svendsen did not inform Eakin of any time periods or deadlines within which an application for the patent would need to be filed.

As a result of the phone call, Chris Svendsen completed a law firm form entitled "'Screening Interview'" used to perform a conflicts check. CP at 241, 560. The form includes a script containing questions for the attorney to ask the potential client. The form reads:

> Therefore, in order to avoid a potential conflict of interest, we need to ask you a few questions. We can then conduct a quick internal conflict check and call you back, most likely before the end of business today.

CP at 395 (emphasis omitted). Under the script, the attorney asks the potential client his or her name, the general field to which his or her project relates, any employment, and any dispute over the invention. The form confirms that Svendsen asked Eakin these questions.

5

As part of his response to this lawsuit, Chris Svendsen contends that no attorney-

client relationship began with John Eakin until late 2007. Nevertheless, in his deposition,

Svendsen testified:

> Q . . . What is a screening interview?
> A Just a basic document that Stratton Ballew would circulate when a potential client was—a potential client was—needed to be screened for conflicts *before work began for that client*.
> . . . .
> Q And at the top of this document it's dated August 2nd, 2006?
> A Yes, it is.
> . . . .
> Q And was the purpose of this screening interview for you to talk with Mr. Eakin about getting him a patent?
> A *It was to—to open that door to make sure it was okay for me to formally enter in a client relationship with Mr. Eakin.*
> Q So earlier this morning we were discussing this, you couldn't remember exactly which year this all started.
> A Uh-huh.
> Q So would it be fair to say that this process started in August of 2006?
> A I think that would be fair, yes.
> . . . .
> Q Is this screening interview, Exhibit 9, is this something that would have been done in advance of Mr. Eakin coming in to meet with you?
> A No, not per se. It would have just been in advance of—of the firm being able to do any work for John Eakin.
> Q So do you believe you started the process of working on getting a patent in August of 2006?
> A No, I think it was—it just opened the door so that we could—we could discuss in—in—for the purpose of—of obtaining a patent certainly.
> . . . .
> Q So when do you believe you were officially retained to obtain a patent on behalf of—or a patent for this cattle foot-bath system?

6

A  Well, retainer, I—I seldom charge retainers.  My—my relationships with my clients generally begin with the—with the understanding that they've contacted me and I'm going to be helping them in a—in a—in a certain project.  What—the—*as I recall it would have been in the fall of 2007 that there would have been a formal—more formal, Okay, we're going to file this and it's going to cost this amount.*  And we're going to—and we're going to go forward with it.

Q  Let me ask it a different way.  When do you believe the attorney-client relationship began for the effort to get a patent for the cattle foot-bath system?

A  I—I would—I would say that that would have been in the mind of John Eakin and – and is a big part of that.  And I'm—*I'm sure he considered this in the fall here of 2006.  That that—that relationship was— a formal relationship had started.*

Q  So at some point did you do a letter to Mr. Eakin setting forth the scope of your representation or what you'd been retained to do or?

A  I believe so.

CP at 271-74 (emphasis added) (boldface omitted).  Despite this answer, neither party submitted any formal representation agreement or letter as part of the summary judgment motion pleadings.

After the August 2006 phone call between John Eakin and Chris Svendsen, Svendsen and other members of the law firm, Stratton Ballew, conducted a conflict of interest search.  Patent attorneys' conflict searches principally concern the nature of the invention rather than the names of parties.  On August 10, 2006, Svendsen completed the investigation and found no disqualifying conflicts.

Someone also completed a law firm form, dated August 10, 2006, entitled "Client Information." CP at 561 (some capitalization omitted). The form indicated that John Eakin wished a patent for a method of dispensing bactericide. The sheet identified John Eakin as Client No. EA12. Svendsen also sent a thank you card to Wes Gano for the referral.

The parties provided no information as to whether Chris Svendsen called John Eakin after the conflicts check, and, if so, the nature of the remarks made between the two during any such conversation. We note that, during the August 2 phone call, Eakin had told Svendsen "to wait to hear back from him." CP at 488.

John Eakin displayed his second prototype of the cattle footbath at the 2006 Dairymen's Show in Boise, on November 11-13, 2006. An Occupational Safety and Health Administration inspector attending the show suggested to Eakin that he add a device to capture the formaldehyde fumes. Stratton Ballew law firm notes suggest that John Eakin called someone at the law firm on December 4, 2006.

From August 2006 until October 2007, John Eakin and Chris Svendsen occasionally encountered each other in social settings. During these junctures, Svendsen inquired about the footbath, and Eakin answered that he still tinkered on the invention and had not placed the invention into use. The two conducted no business or attorney-

client meetings during these months. Svendsen did not ask Eakin if he publicly displayed or allowed the use of the invention.

In late 2006, John Eakin began development of a third prototype, which he finalized in May 2007. Eakin avers that, on December 7, 2006, he faxed Chris Svendsen a three-page note to inform Svendsen that he was changing his invention to include a return system for capturing the formaldehyde. Eakin has not produced a copy of any fax. Svendsen does not recall receiving any fax. In the third prototype, the check valve vented the formaldehyde's fumes into a closed circuit, which returned the fumes to the storage tank rather than permitting the fumes to escape into the air.

In deposition testimony, John Eakin averred:

> Q. Okay. Then it says, "We have also applied for patent for the delivery system."
> Do you see that language?
> A. Yes, correct.
> Q. Okay. As of February 14, 2007, had a patent been applied for?
> A. Oh, no. Actually, we didn't apply for the patent until later. We -- that was certainly on the books and in the works at that point. That's what we discussed to do. *I just didn't know who to get to, to do it.*
> Q. So you really hadn't applied for a patent at this time?
> A. Not at that time. I had not.

CP at 588 (emphasis added). This testimony of John Eakin may suggest that, as of February 2007, he had not yet chosen an attorney to assist in seeking the patent.

9

By late October 2007, John Eakin sought to gain the assistance of Chris Svendsen in gaining patent protection for his cattle footbath. In October 2007, John Eakin and Chris Svendsen met. Eakin then submitted drawings that detailed prototype three of the footbath system. Eakin had just returned from another dairy show. Chris Svendsen testifies that, in October 2007, he advised Eakin that Eakin could not garner a patent for a prototype that had been in use for more than a year. Eakin responded that no one had placed the footbath system into use. According to Svendsen, Eakin added that he had not shown the system to the public. John Eakin disagrees with this testimony of Svendsen. Eakin denies that Svendsen asked, in October 2007, questions about earlier use or display of the invention. Svendsen thereafter began the task of preparing a patent application.

We could end our statement of the facts here if the only question on appeal concerned whether the trial court properly granted Chris Svendsen summary judgment on the question of whether the parties commenced an attorney-client relationship in August 2006 such that Svendsen owed a duty to John Eakin by this date. Nevertheless, Svendsen challenges the trial court's certification of the grant of summary judgment for immediate review by this Court of Appeals. Therefore, we must recite facts related to other claims of malpractice against Svendsen.

The United States Patent and Trademark Office permits the filing of two types of patents: provisional patents and nonprovisional patents. A provisional application allows a quick and inexpensive method for an inventor to establish a filing date for his or her invention, which date the inventor can claim in a later-filed nonprovisional application. The patent office does not examine the provisional application. The applicant automatically abandons a provisional application twelve months after its filing date. An applicant who initially files a provisional application must file a corresponding nonprovisional application during the twelve-month pendency period of the provisional application in order to benefit from the earlier provisional application filing date. A patent examiner reviews a nonprovisional application, and the patent office may issue a patent if the application and invention meet all requirements for patentability.

In Chris Svendsen's summary judgment motion declaration and in the declaration of John Eakin's expert, Mark Lorbiecki, both respectively educate the court on patent law and, in particular, how an inventor applies for and obtains patents. A patent application form has two distinct sections. The first section, known as the "specification," identifies earlier inventions related to the same subject matter of the applicant's invention. Patent argot labels these earlier inventions as "prior art." The specification section also describes how the invention differs from prior art, lists the uses to which the invention

11

may be put, explains the working of the invention, and contains a drawing of the invention. The second section of the patent application form recites any "claim limitations," sometimes referred to simply as "claims." The claims section defines the invention. Claim limitations narrow the scope of a patent's exclusionary effect toward competing and potentially "infringing" devices. If the applicant identifies a feature of the invention as a claim limitation, a competing device infringes on the patent only if the device utilizes the same feature.

Mark Lorbiecki and Chris Svendsen may disagree as to the legal effect of the patent application's specification section. According to Lorbiecki, the specification section imposes no preclusive effect on other inventions, although the specification section may help to construe the extent of the contents of the claim limitations. According to Svendsen, a feature, not identified as a claim limitation but referenced within the narrative description, may cause preclusive effect on another inventor or invention. In other words, another invention may not copy that feature. According to Svendsen, a clever competitor can better sidestep a patent with more claim limitations. Therefore, an adroit applicant initially avoids many and detailed claim limitations and instead relies on the features in the specification section of the application form to preclude competing inventions.

On November 21, 2007, Chris Svendsen, on behalf of John Eakin, filed for a provisional patent for the footbath system. The application drafted by Svendsen specifically included the return valve and closed circuit features, features of the third prototype. Nevertheless, Svendsen placed those features within the narrative description, not as a recited claim limitation. According to Svendsen, he aimed to obtain a broad patent, rather than a narrower and, thereby, less valuable patent. Also according to Chris Svendsen, inclusion of the return valve and closed circuit in the claim limitations section of the provisional application would have unnecessarily prevented John Eakin from refashioning the invention. According to John Eakin's expert, Mark Lorbiecki, the nonprovisional application for the footbath system contained no distinct patentable inventions.

As a result of the filing of the provisional patent application form, the United States Patent and Trademark Office issued John Eakin a provisional patent for the cattle footbath under #61/004,123. Eakin had one year to convert the provisional patent into a nonprovisional patent.

On November 21, 2008, Chris Svendsen, on behalf of John Eakin, filed for the nonprovisional patent on the cattle footbath system. The application listed five claims in the claim limitations section of the application. Nevertheless, due to a clerical error, the

application for the nonprovisional patent listed #60/004,125, not #61/004,123, as the number for the corresponding provisional patent. In other words, Svendsen inserted the wrong number.

In the normal course of the United States Patent and Trademark Office's procedure, an assigned examiner, on receipt of a nonprovisional patent application, searches the patent rolls to compare other inventions with the claim limitations section of the nonprovisional application. The examiner thereby assesses the novelty of the applicant's claims. On October 8, 2010, the patent office sent an "[o]ffice [a]ction" to John Eakin. CP at 201. In the office action, the examiner rejected John Eakin's claim limitations 1, 2 and 5, each of which identified a feature of Eakin's invention, as being anticipated by a patent application filed in 2008 by a fellow named Gerk.

Gerk filed an application with the patent office that asserted an invention of a "'foot bath for animal hoof use is continuously or intermittently replenished with treatment solution while in service. This technique maintains a consistent concentration of treatment chemical, dilutes organic matter deposited in the foot bath and effects removal of fibrous material while maintaining the foot bath in continual service for efficacious treatment.'" CP at 203. John Eakin filed his provisional application in the year before Gerk published his invention. Therefore, according to Mark Lorbiecki, if

14

Svendsen had perfected the application within a year with the correct number for the provisional patent, Eakin could have disqualified Gerk's invention. In other words, Eakin's invention would have gained priority over Gerk's invention.

Remember that Mark Lorbiecki opines that the provisional patent application form did not perfect any tentative patent rights because Chris Svendsen placed the description of the invention features in the narrative description section of the application form rather than in the claim limitations section. According to Lorbiecki, once the patent examiner rejected the claim based on prior art, Chris Svendsen could have also corrected John Eakin's faulty patent by, among other things, preparing and filing an oath of John Eakin to the effect that he had employed the formaldehyde metering invention by late 2006. Eakin could have then readily proved the priority over Gerk by attaching the provisional application to this oath. According to Lorbiecki, Svendsen violated the standard of care by failing to correct the wrong number of the provisional patent and by failing to file the oath and thereby gain priority over Gerk.

As a result of the notice of the Gerk patent, Chris Svendsen amended John Eakin's patent claim to avoid Eakin's patent overlapping the claim of Gerk's patent. This amendment limited the breadth of Eakin's claim. Eakin gained a claim only over the return circuit of the formaldehyde fumes, the feature added in the third prototype.

15

In 2011, John Eakin discovered that another firm, Specialty Sales, LLC, manufactured and sold a cattle footbath system that he believed violated his patent. On September 23, 2011, Chris Svendsen, on behalf of John Eakin, filed a patent infringement lawsuit against Specialty Sales. During the lawsuit, Eakin signed declarations stating that he first displayed any prototype in 2007, despite the displays at the Dairymen Shows in 2005 and 2006. Nevertheless, during a September 26, 2012, deposition, Eakin conceded that a Nampa dairy utilized the second prototype system in the summer of 2006 and that he displayed the footbath at the Idaho Dairymen's Show in November 2006. Chris Svendsen learned for the first time about the earlier use and display of any of the prototypes. After John Eakin's testimony, Chris Svendsen advised Eakin that the patent was invalid because of the use of the invention for a year before Eakin filed for the patent.

Chris Svendsen discovered the clerical error of the provisional application's number placed in the nonprovisional application during the lawsuit by John Eakin against Specialty Sales. Svendsen determined that the patent could not be rehabilitated. On March 6, 2012, Svendsen commenced the process of seeking a reissue patent for the cattle footbath delivery system through the submission of a reissue application. In

December 2015, Svendsen, however, withdrew representation of Eakin, because of a conflict resulting from Eakin suing him for malpractice.

The United States Patent and Trademark Office, in 2017, issued the new patent for John Eakin's cattle footbath invention, after Eakin retained another attorney to assist in the reissue application. By the issuance, Eakin received the patent, for which he initially applied, except for the inclusion of a return vent.

PROCEDURE

John Eakin and his corporation, Eakin Enterprises, Inc., brought this lawsuit against Chris Svendsen; Rex Stratton; Patrick Ballew; Svendsen Legal, LLC; Stratton Law & Mediation, P.S.; and Stratton Ballew, PLLC. For simplicity purposes, we refer in this opinion to all plaintiffs as John Eakin and all defendants as Chris Svendsen.

In his second amended complaint, John Eakin alleges that he retained Chris Svendsen and his law firm in 2006 with regard to "all matters" associated with obtaining a patent for the footbath delivery system. CP at 50. The second amended complaint asserts five causes of action: legal malpractice, breach of contract, failure to gain informed consent, Consumer Protection Act violations, and breach of fiduciary duty. In support of the claim for legal malpractice, Eakin contends that Svendsen violated the standard of care of a patent attorney in Washington State by: (1) improperly preparing and

17

filing Utility Patent Application no. 12/313,601 which claimed the benefit of Provisional

Patent Application no. 60/004,125, but failed to claim the benefit of Provisional Patent

Application no. 61/004,123, (2) failing to timely notice the error in filing for Utility Patent

Application no. 12/313,601, which in turn meant failure to timely perfect United States

Patent no. 7,987,820, (3) failing to timely challenge Gerk as prior art in order to obtain

Utility Patent Application no. 12/313,601's priority over the Gerk patent, (4) filing an

amendment to Utility Patent Application no. 12/313,601 that narrowed the scope of the

patent by reciting limitations to avoid the Gerk patent, and (5) failing to properly advise

John Eakin as to the viability of the lawsuit against Specialty Sales. The allegations with

regard to breaches of contract echo the claims of legal malpractice. In his claim for lack

of informed consent, Eakin alleges that Chris Svendsen failed to inform him of his errors

and omissions such that Eakin could retain other counsel to timely correct mistakes

performed by Svendsen. In the claim for breach of fiduciary duty, Eakin contends that

Svendsen violated the duty of candor by: (1) claiming that the patent office, not he,

created the typographical error in the Utility Patent Application no. 12/313,601 and that

the error could be corrected, and (2) failing to inform Eakin that he could challenge the

priority of the Gerk patent. Remarkably, the second amended complaint alleges no breach

of duty by Svendsen by failing to advise John Eakin, in August 2006, of the possibility of

losing patent rights if he did not apply for the patent within one year of use or display of the invention.

Chris Svendsen filed a motion for summary judgment dismissal. He argued that only the federal courts held subject matter jurisdiction over the claims against him because, for John Eakin to prevail, the court would need to declare that Eakin held a valid patent, a declaration involving a federal question of law. Svendsen also contended that Eakin could not recover for any breach of duty because Eakin, in 2006, failed to disclose to, if not misled, Svendsen about public display and use of the footbath delivery system. In support of his summary judgment motion, Svendsen filed a declaration, in which he testified he served as Eakin's attorney only from October 2007 until December 2015. Nevertheless, Svendsen did not argue in his opening brief for dismissal of any claims because the attorney-client relationship did not begin until October 2007.

John Eakin filed a cross motion for a partial summary judgment ruling that Chris Svendsen violated the standard of care applicable to patent attorneys. As part of the motion, Eakin postulated that, between 2004 and 2006, he invented three discrete prototypes of a cattle footbath system. By May 2007, Eakin perfected the third prototype of the footbath and requested that Chris Svendsen obtain a patent for the footbath. Eakin argued that, by placing the description of the formaldehyde return system in the

specification rather than claim section of the patent application, Svendsen in essence filed an application for a patent only on the second prototype of the footbath rather than the third prototype of the footbath. Then, between 2007 and 2011, Svendsen failed to properly correct and prosecute the application for a patent on the footbath. As a result, Eakin purportedly never procured an enforceable patent for the third prototype footbath. Also, Eakin alleged that Svendsen negligently encouraged Eakin to file a patent infringement suit against Specialty Sales without adequately performing the required prefiling investigation that would have revealed no basis for a patent infringement suit against Specialty Sales. Svendsen continued to pursue the patent infringement lawsuit after he knew Eakin lacked a basis for the patent infringement suit against Specialty Sales.

As part of his cross motion for summary judgment and in opposition to Chris Svendsen's summary judgment motion, John Eakin submitted a declaration of expert Mark Lorbiecki, in which declaration Lorbiecki disagreed with Chris Svendsen as to the date on which the parties formed an attorney-client relationship. Lorbiecki testified: "[t]o assess Mr. Svendsen's representation, it is first necessary to fix the date when representation began." CP at 192. Lorbiecki opined that the relationship and Svendsen's duties began in August 2006.

20

In his declaration, Mark Lorbiecki, a Seattle patent attorney, opined that Svendsen violated the standard of care applicable to patent attorneys in seven ways:

1. Svendsen did not conduct a sufficient interview to discern appropriate facts nor to adequately inform Eakin of the need to file an application within one year of reduction to practice of the footbath invention;

2. Svendsen failed to timely file a patent at some reasonable time after the initial interview, on August 2, 2006, and before November 13, 2007, to cover the 2006 Dairymen's Show exhibit;

3. Svendsen failed to correct the priority claim to include the provisional patent application of November 21, 2007, at any time during the patent prosecution;

4. Svendsen unduly narrowed the claims of the utility patent rather than to assert the validity of the claims over the Gerk, et al. reference;

5. Svendsen failed to secure a valid patent based upon the utility filing even after the failure of the claim of priority;

6. Svendsen failed to perform a suitable prefiling investigation before filing the patent assertion lawsuit against Specialty Sales; and

21

7. Svendsen failed to timely dismiss the lawsuit against Specialty Sales by moving for dismissal of the case and covenanting not to sue Specialty Sales.

In his declaration, Mark Lorbiecki averred that a patent lawyer must inquire of the inventor, during the initial interview, about any prior public showing or offering of the invention. Lorbiecki opined:

> Thus, in the initial interview, a patent practitioner meeting the standard of care within the community of prudent patent practitioners must ask three questions of grave import: What is your invention? Does anybody else know about your invention? How did they learn of it; did you show it to them?

CP at 185. At the same time, Lorbiecki agreed that a patent attorney holds no duty to provide advice to a person until the formation of the attorney-client relationship.

Mark Lorbiecki declared that John Eakin and Chris Svendsen formed an attorney-client relationship on August 2, 2006, if not earlier, during the duo's initial telephone conversation. He does not explain how the relationship could have begun before August 2. Lorbiecki emphasized the initial interview sheet, on which Svendsen wrote that Eakin sought patent protection for his hoof sanitation system. According to Lorbiecki, on August 2, Chris Svendsen held a duty to inquire as to each exposition to the public of any embodiment of the invention and to advise Eakin of the implications of any public showing of the footbath system. Lorbiecki believes an attorney possesses the obligation to

inquire about, rather than the client holding a duty to voluntarily disclose, any display or use of the invention, since the attorney holds the expertise in patent law. Assuming Svendsen had asked Eakin the questions and Eakin had answered truthfully, Svendsen should have, with all deliberate speed, prepared a patent application in August 2006.

In his declaration, Mark Lorbiecki also faulted Chris Svendsen for failing to place the formaldehyde return valve and pipe in the claim limitations of the 2007 provisional application and the 2008 nonprovisional application. Mark Lorbiecki did not necessarily fault Chris Svendsen for appending the wrong provisional patent number to the nonprovisional patent application. Patent law allows for amendments to correct and add to the patent. Instead, Lorbiecki blamed Svendsen for not timely correcting the error so as to perfect the claim. According to Lorbiecki, Svendsen could have noticed the error if he carefully reviewed the patent examiner's office action and other notifications from the patent office.

We note that Mark Lorbiecki's declaration extended the allegations of professional negligence against Chris Svendsen beyond the allegations in the second amended complaint. Lorbiecki added a failure to inquire, in August 2006, of earlier or current uses of the footbath system and a failure to warn Eakin of the display or use of the footbath. The parties then proceeded with the litigation as including these additional claims of

negligence such that we conclude, at least for purposes of this appeal, that the second amended complaint was amended, under CR 15(b), to conform to the evidence.

As part of John Eakin's motion for summary judgment against Chris Svendsen, Eakin needed to establish the predicate fact, as a matter of law, that he and Svendsen formed an attorney-client relationship as early as August 2006 at least with regard to some of his theories of liability. Eakin wrote in his summary judgment brief:

> In the present case it is undisputed that an attorney-client relationship existed between John Eakin and the defendants going back to 2006. Defendant Svendsen acknowledged in his deposition that this process started in August of 2006 and further acknowledged that John Eakin reasonably believed that a formal attorney-client relationship started in the fall of 2006.
> Following August of 2006, Mr. Eakin's conduct vis-a-vis the defendants implied that an attorney-client relationship existed.

CP at 151. John Eakin did not then file a declaration in support of his summary judgment motion or in opposition to Chris Svendsen's summary judgment motion.

Chris Svendsen filed a brief opposing John Eakin's motion for summary judgment. In his brief, Svendsen disputed that any attorney-client relationship commenced in August 2006. Svendsen wrote:

> f. The August 2006 Telephone Discussion was Merely a "Screening Interview," Not an "Initial Interview" Between an Existing Client and a Retained Lawyer.

24

Mr. Lorbiecki notes that it is "uncontested that Mr. Svendsen interviewed Mr. Eakin at least on August 2, 2006 (if not earlier)." *See Declaration of Mark Lorbiecki*, 18:5-6 (parenthetical in original). Mr. Lorbiecki then opines as follows: "The obligation to explore prior and planned disclosure events began, at least, on August 2, 2006." *See id.*, 18:12-14. This is untrue, both factually and legally.

CP at 431 (boldface omitted).

Chris Svendsen concluded his argument in his reply brief:

It follows that the plaintiffs are not entitled to summary judgment in their favor on the allegation that Mr. Svendsen was supposedly obligated to explore prior use and/or display occurrences as of the initial communication with Mr. Eakin in August of 2006.

CP at 434. Svendsen cited cases in his responding brief that addressed the formation of the attorney-client relationship.

Chris Svendsen also filed a reply brief in support of his motion for summary judgment. He repeated his argument, from his brief in opposition to John Eakin's motion, that he did not become Eakin's attorney merely by meeting him in August 2006. Svendsen cited case law and treatises and analyzed the facts to support his contention.

At the conclusion of oral argument in support of and in opposition to the cross motions for summary judgment, the trial court commented that, under the undisputed facts, the attorney-client relationship between Chris Svendsen and John Eakin did not form until October 2007. The court concluded that, based on undisputed facts, Eakin

25

showed the second prototype footbath at the fall 2006 Dairymen's Show, such that Eakin could not claim a patent for the second prototype. Presumably, the trial court did not blame Svendsen for the inability to patent the second prototype because Eakin never disclosed the earlier display to Svendsen. The court dismissed all claims of negligence for conduct or omissions purportedly occurring before autumn 2007. The court reserved for trial all other claims of malpractice.

After the summary judgment motions hearing, but before entry of a written order, John Eakin filed a declaration in opposition to Chris Svendsen's summary judgment motion and a supplemental memorandum. In the newly submitted declaration, John Eakin added testimony about his relationship with Chris Svendsen. Eakin declared that Svendsen advised him that he held no conflict in representing him and, since that time, Eakin considered Svendsen to be his attorney. The declaration further stated that, had Svendsen asked Eakin about the status of his invention or warned him of application deadlines, Eakin would have disclosed that he displayed a prototype on a dairy farm the summer of 2006 and that he intended to display the prototype at the Boise Dairymen's Show in the fall of 2006.

Chris Svendsen moved to strike John Eakin's late-filed declaration and supplemental memorandum. The trial court granted the motion to strike. The court also

entered a written order on the cross motions for summary judgment. John Eakin

voluntarily dismissed his claim made under the Consumer Protection Act, chapter 19.86

RCW.

At the request of John Eakin and over the objection of Chris Svendsen, the trial

court certified the summary judgment order as a CR 54(b) order. During the hearing on

certification, the trial court addressed the four factors blanketing certification for

immediate appellate review:

> First of all, the relationship between the adjudicated and
> unadjudicated claims. They are closely related to the extent that there are
> background facts necessary for the adjudication of the third prototype issue,
> but they are separate facts with regard to the adjudication of the second
> prototype. So they're related but a lot of it is background information that
> would be helpful to the trier of fact to understand what occurred in
> adjudicating the third prototype issue. So that's kind of a mixed bag, but
> there are, there is a relationship but they're separable, as far as this Court's
> concerned.

Report of Proceedings (RP) at 120-21.

> The second factor is the question, is whether questions which would
> be reviewed on appeal are still before the Trial Court for determination in
> the unadjudicated portion of the case, and this is really, I'm satisfied with
> the argument that I've heard. I understand that there wasn't more than
> basically a cursory statement with regard to that, as far as the plaintiffs'
> briefing. However, I tend to agree that the point is rather obvious, that the
> question on appeal would be pretty much when the attorney/client
> relationship was established and whether or not there was a material issue
> of fact as to that, and when I exercised my judgment on that particular issue,
> I didn't find the inferences that I was being asked to be reasonable

27

inferences and the issue itself or the issues themselves are fairly simple issues; the subject matter is rather complex, and I think that's where we bog down sometimes, but I think that I agree with the plaintiff that the questions on appeal are fairly simple and they are separate.

RP at 121.

With regard to the third issue, whether it is likely that the need for review may be mooted by future developments in the Trial Court, I tend to disagree with the defense. I don't think that even if the factfinder were to find in favor of the plaintiffs that the relief would be the same as if all of the claims were brought before the Court, and I understand that that supposes some facts or speculates a little bit, but I think that there, it may be, it could be moot but, on the other hand, there are a lot of other issues, particularly the issue of, as the plaintiff makes in context, the essence of their complaint or the essence of their claim is essentially gone, which is the significant damage portion and it is significantly different than the issues on the third prototype.

RP at 122.

With regard to the fourth factor, whether an immediate appeal will delay the unadjudicated matters without gaining any offsetting advantage in terms of the simplification and facilitation of trial and the practical effects of allowing an immediate appeal, obviously the practical effect of allowing an immediate appeal would be to essentially stay the proceedings at this level and to cause delay.

The question is not so much the delay or the effect of the stay as much as it is the offsetting advantage, in terms of simplification and facilitation of a trial, and my finding on that is that yes, it would cause delay and yes, it would cause a stay, but overall if it were to be determined at the appellate level that this Court was wrong with regard to the summary judgment, it is in the benefit of not only the parties but also the Court that there would be a simplification and facilitation at the trial level of all issues before the Court, and that would be a benefit and offsetting advantage as far as this Court's concerned with regard to the ultimate resolution of this case,

and for those reasons I am going to ask that we talk about the written findings that are necessary.

RP at 122-23.

## LAW AND ANALYSIS

### Motion to Remand

Before addressing the underlying merits of the trial court's grant of a partial summary judgment order in favor of Chris Svendsen, we must address three procedural questions: first, whether the trial court reasonably granted certification for immediate review of the order; second, whether Svendsen timely presented, in his summary judgment pleadings, the question of when the attorney-client relationship commenced; and third, whether the trial court properly struck a declaration of John Eakin filed after the court's oral ruling on summary judgment. We address these questions in such order.

Chris Svendsen moves this court to vacate the trial court's CR 54(b) certification and remand this case for adjudication of still pending claims. Svendsen argues that the claims on appeal and those pending before the trial court are not distinct, and, therefore, John Eakin did not satisfy the requirements for CR 54(b) certification. Eakin responds that the trial court considered the factors enumerated under CR 54(b) and found, within its discretion, the claims separable. We agree with Eakin. The dismissed claims are

sufficiently distinct from the remaining claims that the trial court did not abuse its

discretion when certifying the summary judgment order for immediate appellate review.

The first sentence of CR 54(b) declares:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination in the judgment, supported by written findings, that there is no just reason for delay and upon an express direction for the entry of judgment.

RAP 2.2(d) reads similarly. CR 54(b) permits an immediate appeal when "it could be

unjust to delay entering a judgment on a distinctly separate claim until the entire case has

been finally adjudicated." *Nelbro Packing Co. v. Baypack Fisheries, LLC*, 101 Wn. App.

517, 522, 6 P.3d 22 (2000) (footnote omitted). Courts and litigants often label a trial

court's declaration of a partial judgment being final as "certified," although CR 54(b)

omits the term. 4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR

54(b) author's cmts. at 320 (6th ed. 2013). Certification of a judgment as final renders

the judgment immediately appealable, even though the case may continue in the trial

court with the remaining claims and parties. 4 KARL B. TEGLAND, WASHINGTON

PRACTICE: RULES PRACTICE CR 54(b) author's cmts. at 319 (6th ed. 2013).

Entry of a final judgment under CR 54(b), when remaining claims pend before the trial court, requires satisfaction of four elements:

> There must be: (1) more than one claim for relief or more than one party against whom relief is sought; (2) an express determination that there is no just reason for delay; (3) written findings supporting the determination that there is no just reason for delay; and (4) an express direction for entry of the judgment.

*Nelbro Packing Co. v. Baypack Fisheries, LLC*, 101 Wn. App. at 523 (2000) (footnote omitted). Chris Svendsen challenges only the fulfillment of the first requirement. Thus, we must decide whether to characterize claims based on the third prototype as a different "claim" from claims based on the second prototype. We recognize Svendsen's reservations about the terms "second prototype" and "third prototype," because Svendsen claims that the patent application he prepared in November 2007 covered both the formaldehyde metering gadget and the return of fumes device. For ease, however, we refer to the form of the invention that did not include the fumes return as the second prototype.

When adjudicated and pending claims overlap and stem from essentially the same factual allegations, concerns for judicial economy encourage the delay of an appeal until all issues can be considered by the appellate court in a unified package. *Nelbro Packing Co. v. Baypack Fisheries, LLC*, 101 Wn. App. at 526. Piecemeal appeals must be avoided

31

in the interests of speed and judicial economy. *Maybury v. City of Seattle*, 53 Wn.2d 716, 721, 336 P.2d 878 (1959).

The ultimate determination of multiplicity of claims must rest in every case on whether the underlying factual bases for recovery state a number of different claims that could have been separately enforced. *Nelbro Packing, Co. v. Baypack Fisheries, LLC*, 101 Wn. App. at 524 (2000). When facts give rise to more than one legal right or cause of action, or when the claimant seeks more than one possible form of recovery and they are not mutually exclusive, the claimant has presented multiple claims for relief. *Nelbro Packing, Co. v. Baypack Fisheries, LLC*, 101 Wn. App. at 524. A claim may be appealable even if not of an entirely separate "occurrence or transaction." *Nelbro Packing, Co. v. Baypack Fisheries, LLC*, 101 Wn. App. at 523. The court may inquire as to whether theories of liability involve a review of separate facts. *Gull Industries, Inc. v. State Farm Fire & Casualty Co.*, 181 Wn. App. 463, 482, 326 P.3d 782 (2014).

This court bestows deference to the trial court's decision that an order is final "as to any of the claims or parties" under CR 54, but we do not automatically affirm the decision. *Nelbro Packing Co. v. Baypack Fisheries, LLC*, 101 Wn. App. at 523. The trial court's decision to certify a claim for immediate appeal requires substantial deference when the trial court provides an analysis of the competing factors required to certify a

decision.  *Solomon v. Aetna Life Insurance Co.*, 782 F.2d 58, 61 (6th Cir. 1986).  Our

trial court engaged in an analysis of all factors.

Chris Svendsen emphasizes that John Eakin did not plead, in his second amended

complaint, separate claims per prototype, but instead advanced allegations regarding

multiple prototypes within each cause of action.  Svendsen also argues that the as-filed

patent application included the features of the third prototype and thus was not an

exclusive claim based on the second prototype.  Therefore, Svendsen reasons, this case

should be remanded as the third prototype overlaps the second prototype in scope.

We agree with Chris Svendsen that John Eakin does not distinguish in his

complaint between claims based on a second prototype and a third prototype.  He does not

even use the term prototype in the complaint.  We also observe that the causes of action

and the requests for relief overlap with regard to the two or three generations of the

footbath system.  Nevertheless, we reject Svendsen's argument as advancing form over

substance.  We prefer to focus on the underlying facts and discrete acts or omissions that

Eakin alleges entailed negligence.

Although John Eakin claims malpractice of Chris Svendsen with regard to both the

second prototype and the third prototype, the facts supporting the allegations and the

conduct that constituted negligence diverge.  The claims based on the second prototype

33

assume an attorney-client relationship commenced in August 2006 and mainly concern a failure by Chris Svendsen to ask John Eakin about prior or current display or use of the invention and failing to warn Eakin of overtly displaying any generation of the footbath system. The claims centered on the third prototype can proceed even if the attorney-client relationship did not begin until autumn 2007. The third prototype claims surround the typographical error in the patent application, the placement of the description of the return valve and system in the application's specification section rather than in the claim limitations section, the failure to later notice the typographical error, the failure to prepare documents to gain priority over the Gerk invention, the failure to warn Eakin of the ramifications of filing suit against Specialty Sales, and the failure to timely disclose to Eakin any possible malpractice such that Eakin could hire independent counsel.

The primary legal question with regard to claims based on the second prototype is: when did Chris Svendsen and John Eakin form an attorney-client relationship? This question does not bear on claims of malpractice related to the third prototype. The damages related to the claims based on the third prototype are more limited than, if not distinct from, the damages available for any malpractice based on the second prototype.

Summary Judgment on Second Prototype

*Basis for Motion*

John Eakin contends that the trial court should not have adjudged, as part of the summary judgment proceeding, that the parties did not form an attorney-client relationship until autumn 2007. Eakin complains that Chris Svendsen never raised the question of when the parties formed the attorney-client relationship in his opening summary judgment brief. Instead, Svendsen waited until reply materials. In response, Svendsen argues that the trial court properly addressed, during the summary judgment procedure, the timing of the formation of the attorney-client relationship, because his declaration in support of his motion contained facts on the issue, because Eakin's expert opined that the relationship began in August 2006, and because briefs from both parties addressed the question of when the relationship commenced.

If the trial court had only entertained a summary judgment motion brought by Chris Svendsen, we would agree with John Eakin that the question of the beginning date of the attorney-client relationship should not have been addressed by the trial court. Svendsen did not give notice to Eakin, by his opening brief, that he sought a ruling on the date. Nevertheless, John Eakin also filed a summary judgment motion, in which he argued that, as a matter of law, the relationship began in August 2006.

The moving party bears the responsibility to raise, in its summary judgment motion, all of the issues on which it believes it is entitled to summary judgment. *White v. Kent Medical Center, Inc. P.S.*, 61 Wn. App. 163, 168, 810 P.2d 4 (1991). The trial court should not allow the movant to raise new issues in its rebuttal materials because the nonmoving party has no opportunity to respond. *White v. Kent Medical Center, Inc. P.S.*, 61 Wn. App. at 169.

John Eakin emphasizes *White v. Kent Medical Center, Inc., P.S.* to argue that the superior court should not have issued a decision about the starting date of the attorney-client relationship. In *White*, the defendant medical center and its doctors moved for summary judgment. After Gladys White submitted rebuttal materials that included deposition testimony alluding to proximate cause, the defense argued for the first time in their reply brief that the court should grant summary judgment on the question of proximate cause. The trial court granted summary judgment based on proximate cause. On appeal, this court held that the trial court granted summary judgment erroneously because the defendants raised the issue of causation in rebuttal pleadings.

We distinguish *White v. Kent Medical Center* on the ground that plaintiff Gladys White filed no cross motion for summary judgment that sought a ruling in her favor on the question of proximate cause. John Eakin filed a cross motion that sought a ruling, as a

36

matter of law, that Chris Svendsen violated the standard of care, and Eakin's motion argued that the parties entered an attorney-client relationship in August 2006.

In support of his motion for summary judgment dismissal, Chris Svendsen included in his own declaration a statement that his representation of John Eakin began in October 2007. Eakin responded by filing a cross motion for summary judgment and submitting a declaration of expert Mark Lorbiecki, in which declaration Lorbiecki disagreed with the attorney-client relationship formation date. Lorbiecki claimed that Svendsen's duty to Eakin began in August 2006. In both parties' summary judgment briefs in support of Eakin's and in opposition to Eakin's motion, the parties presented law on their respective positions as to what actions constituted the formation of an attorney-client relationship.

We rely on another rule to hold that the trial court properly entertained, during the summary judgment proceeding, the starting date of the attorney-client relationship began in August 2006. When the facts are not in dispute, the court may grant summary judgment to the nonmoving party. *Impecoven v. Department of Revenue*, 120 Wn.2d 357, 365, 841 P.2d 752 (1992); *Leland v. Frogge*, 71 Wn.2d 197, 201, 427 P.2d 724 (1967). Since John Eakin's motion sought a ruling that Chris Svendsen became his

lawyer in August 2006, Eakin freed the court to hold in Svendsen's favor that the relationship did not begin on that date.

*John Eakin Declaration*

John Eakin assigns error to the trial court's refusal to consider his supplemental declaration filed after the trial court's oral ruling favoring Chris Svendsen. In so arguing, Eakin contends, in part, that he should have been entitled to file the late declaration since the declaration addressed when the attorney-client relationship began and the trial court should not have decided this issue in the first place. This argument repeats an argument we already rejected.

John Eakin also argues that, under *Cofer v. Pierce County*, 8 Wn. App. 258, 505 P.2d 476 (1973), the law entitled him to file a summary judgment declaration, even after the trial court's oral ruling, as long as he filed the declaration before the entry of the summary judgment order. *Cofer* may stand for this proposition, but *Cofer* is not the final say on the right to file late affidavits.

*Keck v. Collins*, 184 Wn.2d 358, 357 P.3d 1080 (2015) controls John Eakin's assignment of error. Darla Keck sued two oral surgeons, Chad Collins and Patrick Collins, who practiced together. The surgeons moved for summary judgment on the ground that Keck lacked expert testimony to show a violation of the standard of care. The

Collinses scheduled the motion hearing for March 30, without consulting Keck's counsel as to counsel's availability. From March 7 to March 20, Keck's counsel, a sole practitioner, conducted a trial in an unrelated case. On March 16, Keck filed a first affidavit of her medical expert, Kasey Li, M.D., that stated Chad Collins violated the standard of care. On March 22, Keck filed a second affidavit of Li, which addressed purported negligence of both oral surgeons. In reply, the surgeons argued that the first and second affidavits lacked specificity as to negligent care. On March 29, ten days after the CR 56 deadline for filing responding affidavits and the day before the summary judgment hearing, Keck filed a third affidavit of Dr. Li that added the facts that supported his opinions concerning the surgeons' violation of the standard of care. In addition, Keck's counsel filed an affidavit explaining the reasons for the late filing of the third affidavit, including his inability to attend to the minutiae of the affidavits while in trial. Keck's counsel requested that the court either forgive the late filing of the third affidavit or grant a continuance of the summary judgment motion hearing. Defendant surgeons moved to strike Dr. Li's third affidavit as untimely. The trial court issued a memorandum opinion granting defendants' motion to strike the third affidavit as untimely and granting the oral surgeons' summary judgment motion.

The Washington Supreme Court, in *Keck v. Collins*, reversed the trial court.  The Supreme Court adopted three factors the court previously announced in *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997) with regard to whether an untimely disclosed witness should be permitted to testify at trial.  The superior court should on the record, when asked to strike a late affidavit, consider whether a lesser sanction would suffice, whether the violation by the proponent of the evidence was willful or deliberate, and whether the violation substantially prejudiced the opposing party.

On appeal, John Eakin tersely contends that he had the unfettered right to file a late declaration as long as he filed the declaration before the entry of a written order.  Eakin fails to analyze the *Burnet* and *Keck* factors.  Therefore, we decline to address this contention.

RAP 10.3(a)(6) directs each party to supply, in his brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record."  We do not consider conclusory arguments that are unsupported by citation to authority.  *Joy v. Department of Labor & Industries*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012).  Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.  *West v. Thurston County*, 168

Wn. App. 162, 187, 275 P.3d 1200 (2012); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

*Formation of the Attorney-Client Relationship*

We now move to the merits of the appeal. John Eakin contends that the trial court erred when dismissing his claims based on the second prototype. Eakin asserts that an issue of fact lies as to whether Chris Svendsen became his lawyer in August 2006 and, thus, should have warned him about the use and public display of this prototype. Eakin assigns error to the trial court's denial of his motion for reconsideration of the trial court's summary judgment rulings, but he does not include in his brief's argument that the trial court should have granted his cross motion for summary judgment. Instead, he emphasizes that he raised a question of fact as to when he and Svendsen entered an attorney-client relationship.

John Eakin highlights evidence that shows that he, as early as August 2006, subjectively and reasonably believed himself to be Chris Svendsen's client. Eakin argues that he reasonably concluded that Chris Svendsen was his attorney because Svendsen performed a conflicts check in August 2006 and identified Eakin as a client in his law firm's internal documents. Svendsen also sent a note of thanks to attorney Wes Gano for the referral. Eakin highlights a passage in Chris Svendsen's reply declaration that Eakin

41

told Svendsen that Eakin would continue to inform Svendsen of the progress of the invention. According to Eakin, he would not tell Svendsen such unless Eakin deemed Svendsen his lawyer. Finally, Eakin underscores Svendsen's deposition testimony that Eakin probably considered the relationship to have begun in the fall of 2006.

Chris Svendsen emphasizes that John Eakin never shared confidential information and never asked for legal advice until October 2007. According to Svendsen, the August 2006 phone call amounted only to a discussion between an attorney and a potential client. He contends that Eakin misconstrues his deposition testimony. Svendsen highlights Eakin's deposition testimony that, even after 2006, he did not know who he would hire to prosecute his patent. Finally, Svendsen underlines Eakin's concession that he had not perfected his invention until October 2007.

One may wonder if an attorney may hold a duty to a person with whom he discusses possible representation regardless of whether an attorney-client relationship is later formed. Along these lines, one may wonder if an attorney may hold some duty to warn a potential client of conduct that could harm his or her legal rights or warn a potential litigation client of an impending statute of limitations. For example, in *Green v. State*, 667 S.W.2d 528, 531 (Tex. Crim. App. 1984), the accused contacted three

attorneys to defend him in a criminal prosecution, none of whom he hired, but each of whom warned him not to speak to law enforcement officers.

We question the wisdom of a rule requiring an attorney to deliver advice before the formation of an attorney-client relationship, because the attorney usually does not conduct a conflicts check and often cannot conduct a conflicts check because of a lack of information during an initial call or meeting with a potential client. By providing legal advice short of agreeing to represent someone, the attorney could be harming a current client. For example, Chris Svendsen did not know, until he engaged in a conflicts check, whether a current client sought a patent on a similar invention.

Despite conceding before the trial court that he must establish an attorney-client relationship to prevail, John Eakin may argue on appeal that he was owed a duty of care if he was a prospective client and regardless of whether the parties later formed an attorney-client relationship. He cites RPC 1.18 for this proposition. The rule reads in part:

> (a) A person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.
> (b) Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client or except as provided in paragraph (e).
> (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the

43

> prospective client that could be significantly harmful to that person in the
> matter, except as provided in paragraphs (d) or (e).

The rule only prohibits disclosure of confidences and bars representing another with

adverse interests. The rule does not otherwise impose a duty of care to a prospective

client. The cases cited by Eakin in support of his "prospective client" theory only involve

the potential sharing of confidences.

Contrary to John Eakin's new argument on appeal, Washington law holds that to

establish a claim for legal malpractice, generally, a plaintiff must prove (1) the existence

of an attorney-client relationship that gives rise to a duty of care on the part of the

attorney to the client, (2) an act or omission by the attorney in breach of the duty of care,

(3) damage to the client, and (4) proximate causation between the attorney's breach of the

duty and the damage incurred. *Piris v. Kitching*, 185 Wn.2d 856, 861, 375 P.3d 627

(2016) (quoting *Hizey v. Carpenter*, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992)).

Washington follows the universal rule that the claimant must prove the creation of an

attorney-client relationship. *Moshier v. Fisher*, 2019 UT 46, 449 P.3d 145, 148; *Boulders*

*at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 2015 COA 85, 412

P.3d 751, 758; *McColm-Traska v. Baker*, 139 Idaho 948, 951, 88 P.3d 767 (2004);

*Cedeno v. Gumbiner*, 347 Ill. App. 3d 169, 174, 806 N.E.2d 1188, 1192, 282 Ill. Dec.

600 (2004); *Mays v. Askin*, 262 Ga. App. 417, 418, 585 S.E.2d 735 (2003); *C.K.*

44

*Industries Corp. v. C.M. Industries Corp.*, 213 A.D.2d 846, 847, 623 N.Y.S.2d 410 (1995).

The burden of proving the existence of the attorney-client relationship falls on the party contending the relationship existed. *Dietz v. John Doe*, 131 Wn.2d 835, 844, 935 P.2d 611 (1997). When analyzing whether the relationship commenced, Washington courts sometimes rely on attorney disciplinary cases. *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d 393, 410, 98 P.3d 477 (2004); *Dietz v. John Doe*, 131 Wn.2d at 843; *Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992).

Washington follows a broad test when determining when parties form an attorney-client relationship, and then our home state applies a number of tangible rules in applying the broad test. The existence of the relationship turns largely on the client's subjective belief that it exists. *In re Disciplinary Proceeding Against McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983). The client's subjective belief, however, does not control the issue unless it is reasonably formed based on the attending circumstances, including the attorney's words or actions. *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d at 410-11 (2004); *Dietz v. John Doe*, 131 Wn.2d at 843 (1997); *State v. Hansen*, 122 Wn.2d 712, 720, 862 P.2d 117 (1993).

In addition to considering the subjective belief of the purported client, Washington courts review the circumstances surrounding the relationship to determine whether an attorney-client relationship was formed. *Bohn v. Cody*, 119 Wn.2d at 363 (1992). A court must have the facts of what "actually occurred" between two parties in order to determine the legal question of whether the parties established an attorney-client relationship. *Dietz v. John Doe*, 131 Wn.2d at 845 (1997).

One foreign court has concluded that, as long as the client reasonably believes that he is represented by the attorney, the relationship exists. *Mays v. Askin*, 262 Ga. App. at 418, (2003). Nevertheless, for the belief to be reasonable, the belief must be reasonably induced by representations or conduct of the attorney. *Guillebeau v. Jenkins*, 182 Ga. App. 225, 230, 355 S.E.2d 453 (1987). An attorney-client relationship cannot be created unilaterally in the mind of a would-be client. *Uehigashi v. Kanamori*, 161 F. Supp. 2d 221, 225 (S.D.N.Y. 2001); *Guillebeau v. Jenkins*, 355 S.E.2d at 458 (1987).

The dissent relies on language from the Washington Supreme Court in *Bohn v. Cody*, 119 Wn.2d at 363 (1992): "[t]he essence of the attorney/client relationship is whether the attorney's advice or assistance is sought and received on legal matters." Later Washington decisions do not quote *Bohn v. Cody* for this proposition, but rather

characterize *Bohn* as addressing whether an attorney owes a duty to a nonclient and the importance of an attorney telling a third party that he does not represent her.

Under the dissent's bald rule, not only must the purported client ask for advice, the attorney must supply advice. This rule begs the question: is the relationship formed if a person asks an attorney to be her lawyer and the attorney says yes, but does not give advice? Is the relationship formed when, after performing a conflicts check, the attorney informs the potential client that he will assist him and the potential client takes comfort from the offer to provide services? Or is the relationship formed when the parties agree that the attorney will provide advice or legal assistance at some future date? This question is important in John Eakin's appeal because the parties discussed Chris Svendsen providing patent application assistance in August 2006, but Svendsen did not commence work until fall 2007. John Eakin does not identify any advice given by Chris Svendsen before November 2007. To the contrary, Eakin faults Svendsen for failing to give advice.

The relationship need not be formalized in a written contract, but rather may be implied from the parties' conduct. *Bohn v. Cody*, 119 Wn.2d at 363 (1992); *In re Disciplinary Proceeding Against McGlothlen*, 99 Wn.2d at 522 (1983). Even a short consultation may create an attorney-client relationship. *State v. Reeder*, 181 Wn. App.

47

897, 910, 330 P.3d 786 (2014), *aff'd*, 184 Wn.2d 805, 365 P.3d 1243 (2015). Whether a

fee is paid is not dispositive. *In re Disciplinary Proceeding Against McGlothlen*, 99

Wn.2d at 522. The date of a written agreement or receipt of funds does not necessarily

dictate the beginning of an attorney-client relationship. *Fechner v. Volyn*, 3 Wn. App. 2d

716, 722, 418 P.3d 120 (2018).

An attorney-client relationship may be implied from the parties' conduct; it need

not be memorialized in writing. *In re Disciplinary Proceeding Against Egger*, 152

Wn.2d at 410 (2004). In *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d 393,

the court considered one factor in ruling that an attorney-client relationship existed—the

fact that the purported client's name was on a law firm client roster and listed as a client

in connection with a specific case.

In line with Chris Svendsen's argument, an initial interview to determine if the

client wishes to hire the attorney does not necessarily create an attorney-client

relationship. *Hrudka v. Hrudka*, 186 Ariz. 84, 919 P.2d 179, 184 (Ct. App. 1995). The

parties do not create an attorney-client relationship when, during the initial interview, the

purported client reserved the right to make a decision as to whether to retain the lawyer.

*Clark Capital Management Group, Inc. v. Annuity Investors Life Insurance Co.*, 149 F.

Supp. 2d 193, 197 (E.D. Pa. 2001). Nevertheless, when both the purported client and the

attorney envision an attorney-client relationship to go beyond the initial meeting, the relationship may form. *Jacobson v. Pitman-Moore, Inc.*, 624 F.Supp. 937, 942 (D. Minn. 1985), *aff'd*, 786 F.2d 1172 (8th Cir. 1986).

An attorney-client relationship is not created merely because an attorney discusses the subject matter of a transaction with a nonclient. *Bohn v. Cody*, 119 Wn.2d at 364 (1992). The Washington Supreme Court applied this rule in the context of whether the attorney became the attorney for a party conducting a business transaction with the attorney's principal client. Nevertheless, we extract from this rule the principle that Chris Svendsen did not become John Eakin's attorney solely because he discussed the bovine footbath system with Eakin.

John Eakin emphasizes that his attorney standard of care expert Mark Lorbiecki testified that Eakin and Chris Svendsen formed an attorney-client relationship on August 2, 2006. Eakin suggests that his expert's opinion on the formation of the relationship alone creates a question of fact that demands denial of Svendsen's summary judgment motion. We disagree. An expert witness is in no better position than a judge in resolving questions of fact. More importantly, a court can discern and apply rules of law, as to the formation of an attorney-client relationship, as well as any attorney expert witness.

49

In *Mays v. Askin*, 262 Ga. App. 417 (2003), the Georgia court entertained attorney expert testimony on the question of whether the parties formed an attorney-client relationship. At home, however, in a case of whether the attorney-client relationship existed such that communications were confidential, the court noted that the attorney's legal conclusion of whether the relationship commenced was "interesting, but not dispositive." *Dietz v. John Doe*, 131 Wn.2d at 845 (1997). We do not know the legal significance of facts in a Supreme Court opinion deemed "interesting" by the high court. We assume, however, that the state Supreme Court would allow the trial court to ignore the expert lawyer's testimony. The *Dietz* court also decided that it lacked enough information as to whether the relationship began such that the court remanded for further proceedings.

The trial record before us, although lengthy, leaves a vacuum of critical facts. Chris Svendsen or another in his law firm completed a form that suggested John Eakin had become a client. Nevertheless, we are uncertain as to the full extent of the parties' conversation on August 2, 2006, and whether Svendsen, during the phone conversation, suggested he would provide services if he held no conflict with another client or another client's invention. More importantly, we do not know if Eakin and Svendsen spoke shortly after Svendsen confirmed, with his conflict check, the ability to represent Eakin,

and, if so, the comments uttered during such a conversation. The law assumes that the attorney, by action or words, communicates an acceptance of providing services, but the record lacks any comment that Chris Svendsen ever agreed to provide services before October 2007. We do not know if the parties ever agreed to terms of the provision of attorney services or whether one of the parties wished not to enter an attorney-client relationship without the parties first agreeing to terms. We do not know if John Eakin ever expressly told Chris Svendsen that he had retained the latter's services.

We discount Chris Svendsen's objection to John Eakin's use of Svendsen's deposition testimony, during which Svendsen averred that Eakin probably believed an attorney-client relationship was formed in autumn 2006. The question preceding Svendsen's answer enjoyed clarity, and Eakin's counsel had not asked that specific question during the deposition before. Still, we do not know, on what basis, Svendsen concluded that Eakin probably considered the attorney-client relationship to begin this early or whether Svendsen deemed such a belief by Eakin to be reasonable.

Additional facts support Chris Svendsen's legal position. Eakin told Svendsen not to perform any services until Eakin completed additional work on the invention. In his deposition, John Eakin testified:

51

> Q. Okay.  As of February 14, 2007, had a patent been applied for?
> A. Oh, no.  Actually, we didn't apply for the patent until later. We—that was certainly on the books and in the works at that point.  That's what we discussed to do.  *I just didn't know who to get to, to do it.*
> Q. So you really hadn't applied for a patent at this time?
> A. Not at that time.  I had not.

CP at 588 (emphasis added).  We do not know whether to read this passage as a concession that Eakin had not retained any attorney, let alone Chris Svendsen, for patent protection as of February 2007.

Additional facts support John Eakin's position.  John Eakin's comment to Chris Svendsen that he would provide updates to Svendsen on the invention suggests Eakin deemed Svendsen to be his attorney.  John Eakin eventually employed Chris Svendsen's services.

Chris Svendsen suggests that the attorney-client relationship is not formed unless the purported client shares confidential information with the attorney.  We find no case that stands for this proposition.  Although the ability to share confidences with the attorney serves an important role in the attorney-client relationship, some relationships exist without the sharing of confidences.

We could affirm the grant of summary judgment in favor of Chris Svendsen on the basis that John Eakin, as the party asserting the existence of the attorney-client relationship in August 2006, carried the burden of forwarding facts to show the

consummation of the relationship. Yet, Eakin provided the deposition testimony of Svendsen that Eakin probably believed the relationship to exist as early as August 2006. We could reverse the grant of summary judgment in favor of Chris Svendsen, preclude further summary judgment proceedings, and order a trial on the question of when the attorney-client relationship began because Chris Svendsen, as the movant, carried the burden of showing the absence of a material fact. *Hiatt v. Walker Chevrolet Co*., 120 Wn.2d 57, 66, 837 P.2d 618 (1992). Yet, John Eakin never forwarded unambiguous underlying evidence, in opposition to the summary judgment motion, that he held a reasonable belief, as of August 2006, that Svendsen had become his lawyer.

Washington courts repeatedly characterize the question of the existence of an attorney-client relationship as necessarily involving questions of fact. *Fechner v. Volyn*, 3 Wn. App. 2d at 722 (2018); *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d at 410 (2004); *Dietz v. John Doe*, 131 Wn.2d at 844 (1997); *Bohn v. Cody*, 119 Wn.2d at 363 (1992). Summary judgments should be cautiously granted in negligence and malpractice suits. *Blue v. Weinert*, 284 So. 32, 1176, 1177 (Fla. Dist. Ct. App. 2019).

We have listed some important factual questions that the record fails to answer. Summary judgment serves as a proper and valuable instrument for preventing useless trials, but the procedure should not be used when a real doubt exists as to decisive factual

issues. *Bartlett v. Northern Pacific Railway Co.*, 74 Wn.2d 881, 883, 447 P.2d 735 (1968). To satisfy his burden on summary judgment, the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. *Sena v. American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 53, 213 A.3d 1110 (2019). A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law. *Moore v. Morris*, 475 So. 2d 666, 668 (Fla. 1985). Summary judgment should not be granted in the face of "many factual uncertainties." *Wells Fargo Business Credit v. Hindman*, 734 F.3d 657, 670 (7th Cir. 2013); *Northfield Insurance Co. v. Mt. Hawley Insurance Co.*, 454 N.J. Super. 135, 146, 184 A.3d 517 (2018). A court may deny a summary judgment motion when it deems a further inquiry into the facts is desirable. *Ragonese v. Racing Corp. of West Virginia*, 234 W. Va. 706, 709, 769 S.E.2d 495 (2015).

Washington law maintains an ambiguity as to whether the attorney must actually provide some advice before the attorney-client relationship begins. The law does not favor the use of summary judgment, when factual development is necessary to clarify the application of the law. *Henderson v. Coombs*, 192 W. Va. 581, 585, 453 S.E.2d 415 (1994); *Lawver v. Boling*, 71 Wis. 2d 408, 413-14, 238 N.W.2d 514 (1976).

No. 36316-3-III
*Eakin Enterprises, Inc. v. Stratton Ballew, PLLC*

CONCLUSION

We reverse the trial court's grant of summary judgment dismissal of John Eakin's claim based on the alleged failure of Chris Svendsen to warn in 2006 of a public display or usage of Eakin's invention.  We remand to the trial court for further proceedings consistent with this opinion.  Further proceedings could include renewed summary judgment motions based on additional evidence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Siddoway, J.

No. 36316-3-III

LAWRENCE-BERREY, J. (dissenting) — John Eakin had the burden to produce

sufficient facts to withstand summary judgment.  For the reasons stated below, he failed

to do this.  The majority errs by hypothecating about unknown facts that Eakin might try

to establish on remand.  For these reasons, I dissent.

Eakin alleges that Chris Svendsen committed legal malpractice during their initial

telephone call when Svendsen failed to advise him how to protect his potential patent.

The determinative facts are not in dispute.  Eakin informed his friend, attorney Wes

Gano, about an invention.  Gano suggested to Eakin that he call patent attorney Svendsen

about procuring a patent.  Eakin called Svendsen in August 2006.  Eakin told Svendsen

he was working on a cattle footbath system.  Svendsen asked limited questions to assist

with a later conflicts check.  Eakin said he would keep Svendsen posted on the

development of his invention.  Eakin later admitted, by February 2007, he still had not

decided on an attorney to assist him with his patent application.

Although the existence of an attorney-client relationship is a question of fact, the

question can be decided on summary judgment if reasonable minds could reach but one

conclusion.  *Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992).

"The essence of the attorney/client relationship is whether the attorney's advice or

assistance is sought and received on legal matters."  *Id.* (citing 1 RONALD E. MALLEN &

JEFFREY M. SMITH, LEGAL MALPRACTICE § 11.2 n.18 (3d ed. 1989)).[1] The existence of the relationship turns largely on the putative client's subjective belief that it exists. *Id.* The putative client's subjective belief, however, does not control the issue unless it is reasonably formed based on the attending circumstances, including the attorney's words or actions. *Id.* The burden of proving the existence of the relationship is on the party asserting the relationship. *Dietz v. John Doe*, 131 Wn.2d 835, 844, 935 P.2d 611 (1997); *R.A. Hanson Co. v. Magnuson*, 79 Wn. App. 497, 501, 903 P.2d 496 (1995); 1 RONALD E. MALLEN, LEGAL MALPRACTICE § 8:11, at 1022-23 (2019 ed.).

When considering whether an interview with a potential client forms an attorney-client relationship, courts generally look at the purpose of the consultation—whether it was to provide advice on the client's rights and liabilities or whether it was for the attorney to decide whether to undertake representation. 1 MALLEN, *supra* § 8:14, at 1039 (2019 ed.). Courts generally recognize the need for attorneys to investigate a potential client's case before committing to represent them and do not impose liability on these sorts of preliminary interviews barring further commitment on the attorney's part or some other form of follow up. *Id.* The attorney-client relationship is not formed simply because the attorney discussed the subject matter with the potential client. *Bohn*, 119 Wn.2d at 364 (citing 1 MALLEN & SMITH, *supra*, § 11:2 n.19 (3d ed. 1989)).

---

[1] The *Bohn* court cited this source four times in its two-page discussion of the existence of an attorney-client relationship. *Bohn*, 119 Wn.2d at 363-64.

Here, the purpose of the August 2006 telephone call was not to provide Eakin advice. Eakin did not ask for advice. Rather, Eakin discussed his invention. Svendsen asked limited questions so he could later perform a conflicts check to determine whether to represent Eakin. For these reasons, the August 2006 telephone call did not create an attorney-client relationship between Svendsen and Eakin.

The majority states it "could affirm" on the basis that Eakin failed to produce facts sufficient to withstand summary judgment. Majority at 52. Instead, citing out-of-state authorities, the majority gives Eakin a second chance to produce undeveloped facts. Majority at 54. These undeveloped facts relate to a short telephone conversation that occurred in August 2006, almost 14 years ago. No notes exist to refresh the parties' memories. If Eakin needed more time to develop facts concerning this short telephone call, he could have asked the trial court for more time. *See* CR 56(f). He did not. The majority errs by giving him an opportunity he did not request.

The majority hypothecates that Svendsen *might* have told Eakin during the telephone call that he would represent Eakin. There is no evidence of this. Svendsen did not perform a conflicts check until *after* the telephone call. Indeed, Eakin later admitted he had not decided on an attorney even six months *after* the telephone call.

If both parties agreed during the telephone call that Svendsen would represent Eakin, an attorney-client relationship would have formed at the time of the telephone call. Alternatively, if Svendsen said during the telephone call that he would represent Eakin if there were no conflicts, and Eakin later learned Svendsen did not have any conflicts and

3

reasonably believed Svendsen was his attorney, an attorney-client relationship would have formed at that later time. To this extent, the majority correctly states the rule. Nevertheless, the majority errs by allowing Eakin a second opportunity to present evidence.

_____
Lawrence-Berrey, J.